UNITED STATES

v.

**Airman First Class Willis BROADY, III,
FR 139–68–6580, United States
Air Force.**

ACM S25295.

U. S. Air Force Court of Military Review.

Sentence Adjudged 24 Jan. 1981.

Decided 4 Feb. 1982.

Appellate Counsel for the Accused: Colonel George R. Stevens and Captain J. Laurens Tullock.

Appellate Counsel for the United States: Colonel James P. Porter and Captain Richard O. Ely, II.

Before MILES, KASTL and MILLER, Appellate Military Judges.

## DECISION UPON RECONSIDERATION

MILES, Senior Judge:

Contrary to his pleas, the accused was convicted of failure to go, failure to obey a noncommissioned officer's order, violation of a regulation by using Lysergic Acid Diethylamide (LSD) and two specifications of wrongful possession of marijuana in violation of Articles 86, 92 and 134 of the Uniform Code of Military Justice, 10 U.S.C. §§ 886, 892, 934. The approved sentence extends to a bad conduct discharge, confinement at hard labor for sixty days, forfeiture of $250.00 per month for two months and reduction to airman basic.

On 18 January 1982, the Court, on its own motion, reconsidered and withdrew its previous decision of 8 January 1982. The issue we discuss concerns the application of Air Force Regulation 30–2, Social Actions Program, 8 November 1976. Appellate defense counsel assert that accused's admissions to use of LSD were improperly admitted in evidence. We agree.

On 23 December 1980, the accused, using a telephone in the barracks, called the base hospital emergency room seeking immediate medical attention. As a result, an ambulance was dispatched and the accused was treated at the hospital emergency room and admitted. While at the barracks and

at the hospital, the accused made several admissions that he had taken "acid" or "blotter acid."

At trial, the defense counsel objected to all evidence concerning these statements. Among other contentions, the defense claimed that such communications were "incident to medical care" and hence inadmissible. The issue raised involves an interpretation of Air Force Regulation 30–2, Social Actions Program, paragraph 4–24, 8 November 1976, Change 1 (22 July 1977) which provides:

> 4–24. *Incident to Medical Care.* Information about, or evidence of, drug abuse that is revealed incident to medical treatment requested by a member, which concerns the member's use of drugs or possession incident to personal use of drugs, may not be used in whole or in part to support punitive action or an administrative separation less than an Honorable Discharge. However, this paragraph does not exempt the member from disciplinary or other legal consequences resulting from violation of other laws or regulations, such as the sale or transfer of drugs or possession for such purposes. *Evidence of* drug use developed during *emergency treatment* may, *in appropriate circumstances*, be used to support punitive action. [Emphasis added]

The trial judge found that all but one of accused's admissions were made incident to medical treatment requested by him for a drug problem. Nonetheless, the trial judge concluded that because the medical treatment was "emergency treatment" the statements were properly admissible. Appellate defense counsel now dispute that ruling before us.

This appears to be a case of first impression. In my view, the language in paragraph 4–24 including the reference to "emergency treatment" is vague and unclear as applied to the circumstances of this case. The addition of the phrase "in appropriate circumstances" only compounds the ambiguity.

Arguably, the language of "emergency treatment" could provide an exception to the limitation on use of evidence revealed incident to medical treatment. Under this interpretation, evidence revealed about drug abuse, though incident to an accused's requested treatment for drug abuse, would still be admissible *if* the treatment was "emergency treatment." This is the broad interpretation adopted by the trial judge. As gleaned from the regulation and its background, policy arguments can be made favoring this interpretation. For example, trial by court-martial and forced separation, under other than honorable conditions, are concededly important tools to carry out the Air Force Drug Abuse Control Program.[1] In short, this accused went too far to be granted protection and should be tried for his illegal drug abuse. The thorough analysis of the Regulation's background, set forth in Judge Miller's separate opinion, supports this view.

On the other hand, a more narrow interpretation is also available. For example, the language about "emergency treatment" could simply mean that if an accused is comatose (thus receiving medical treatment with his implied consent but *not* at his specific request), evidence about drug abuse revealed incident to such treatment is fully admissible. Arguably, the policy intent behind paragraph 4–24, AFR 30–2, *supra*, in light of the regulation, is to encourage airmen to voluntarily seek medical treatment, including emergency treatment, for all drug problems. If they do so, then they can more readily be identified as drug abusers and treated and rehabilitated. If rehabilitation is not possible, they can more readily be separated from the service because of the incompatability between drug usage and the needs of the service.[2] This is the interpretation adopted by Judge Kastl in his concurring opinion.

1. *See* Air Force Regulation, 30–2, Social Actions Program, paragraph 4–1 (Air Force Policy on Drug Abuse), 8 November 1976; *United States v. Trottier*, 9 M.J. 337 (C.M.A.1980).

2. *Supra*, note 1.

In this case, I conclude the policy makers failed to clarify their intentions in choosing between these competing policy considerations. This accused fits squarely within the protection of the first sentence of paragraph 4–24, AFR 30–2, *supra*, and I am not satisfied that he has lost that protection under the vague language of the last sentence. Under the circumstances, and in view of the requirement to resolve doubts in interpretation in favor of an accused, I will construe the regulation against the Government, which had an adequate opportunity to make the language more precise.[3] Consequently, I will restrict the language about emergency treatment to simply refer to situations where an accused is comatose or similar situations where an accused does not fit squarely within the protection of the first sentence. Since this accused specifically requested medical treatment and was otherwise protected under the first sentence of the paragraph, he did not lose that protection simply because emergency treatment was administered.

Having concluded that this accused was protected under paragraph 4–24, AFR 30–2, *supra*, much of the evidence at trial as to the LSD offense was improperly admitted. Under the particular facts of this case, I conclude also that Charge IV is affected.[4] Hence, the findings of guilty of Charge IV and Charge V are set aside. While a rehearing could be ordered, sufficient admissible evidence does not appear to be available to convict the accused of either of these two offenses upon retrial. In the interests of justice, Charge IV and Charge V, and their respective specifications, are dismissed.

The other assignments of error have been resolved adversely to the accused. Reassessing the sentence on the basis of the remaining findings of guilty, only so much of the sentence as provides for a bad conduct discharge, confinement at hard labor for sixty days and reduction to airman basic is appropriate.

As modified, the findings of guilty and the sentence are

AFFIRMED.

KASTL and MILLER, Judges, concur separately.

KASTL, Judge (concurring in result):

The lead opinion is well-crafted. However, it resolves the meaning of paragraph 4–24, AFR 30–2, by stating that: (a) the paragraph is "vague and unclear" and (b) it will thus be construed against the Government which authored it. I disagree with this approach since I find paragraph 4–24 reasonably clear. It says this: Once an accused requests medical treatment, evidence of personal drug abuse revealed incident to such treatment cannot be used punitively against him; he has secured a safe haven. However, evidence of drug use developed during *emergency* treatment in appropriate circumstances (*e.g.*, where the accused has not requested medical treatment or is comatose) still may be used against him.

Such commonsense reading is consistent with the overall regulatory intent of the urinalysis and Limited Privileged Communication programs; provides a plausible approach to all the words in the paragraph; and presents a consistent, well-reasoned approach within the Air Force Drug program which offers help to drug abusers, whether or not their habits are life-threatening.

MILLER, Judge (concurring in result):

I

The essence of the issue before us today is the proper interpretation of language

---

3. *See, United States v. Enmons*, 410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1973); *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); *United States v. Campos-Serrano*, 404 U.S. 293, 92 S.Ct. 471, 30 L.Ed.2d 457 (1971); *United States v. Baker*, 18 U.S.C.M.A. 504, 40 C.M.R. 216 (1969); *United States v. Burton*, 42 C.M.R. 970 (A.F.C.M.R. 1970).

4. Charge IV, a possession of marijuana offense on 23 December 1980 resulted from a search of accused's quarters based on accused's statements about "acid" and the resulting treatment and admission to the hospital.

contained in paragraph 4–24, Air Force Regulation 30–2, Social Actions Program, dated 3 November 1976. While my brothers limit their discussion to the language of this paragraph, itself, struggling primarily over which of two seemingly contradictory sentences takes priority over the other, I step outside the paragraph, directing my attention to the historical context of the regulatory scheme of which it is a part.

The Senior Judge, after acknowledging that this paragraph's "vague and unclear" language may arguably be interpreted in one of two ways, concludes that "the 'policy makers' failed to clarify their intentions in choosing between ... competing policy considerations (that might underlie these two possible interpretations.)" Without attempting either to uncover existing historical documents that might mandate the "policy makers'" intent or to harmonize the meaning of the paragraph with the purpose of the regulation in which it is contained, he simply "resolve(s) doubts in (the) interpretation (of this paragraph's inartfully drawn words) in favor of an accused."[1]

Judge Kastl, on the other hand, after objecting to the Senior Judge's characterization of the language of paragraph 4–24 as "vague and unclear", finds the meaning of the paragraph "reasonably clear." Nevertheless, he, too, fails to delve into the possibility of historical documents that might mandate the intent of the paragraph. Instead, he simply avers that his interpretation provides "a plausible approach to all (the paragraph's) words" and is consistent with the general philosophy of the Air Force drug program and other specific aspects of AFR 30–2.

While I empathize with Judge Kastl's attempt to fulfill his judicial function as an appellate court judge by providing a "clear" interpretation of paragraph 4–24,[2] I totally disagree with his averment that the "clear" interpretation he suggests is consistent with the general philosophy of the Air Force drug program, particularly in view of the fact that the Air Force drug program merely implements the superior Drug Identification and Treatment Program of the Department of Defense (DoD), authorized and mandated by DoD Directive.

Having failed to clarify the meaning of this paragraph's conflicting sentences through my analysis of the historical context of its regulatory scheme, I finally concur with the conclusion of my brothers that paragraph 4–24's language is drawn so as to preclude logical elimination of the meaning they ascribe to it.

Then, completing my analysis of paragraph 4–24, as written, I note that this same rationale dictates that the language of this paragraph extend not only to personal drug abuse admitted by individuals incident to requested medical care, but also to all personal use/possession "fruits" of such information. I then find that, despite certain preemptive mandates of the DoD which render paragraph 4–24 and its successor null and void, the Government is estopped from denying the validity of these paragraphs until notice of that invalidity is published to the field. I conclude by indicating that I would publish such notice via the Court's opinion in this case.

## II

I begin by analyzing the historical context of the regulatory scheme of which paragraph 4–24 is a part.

A detailed review of the Air Force Drug Abuse Program's history clearly reveals the "lynchpins" underlying any regulatory exemption from prosecution for drug abuse are, and should always have been, either urinalyses administered for the purpose of

1. *See generally, United States v. Louder*, 7 M.J. 548 (A.F.C.M.R.1979) and *United States v. Burton*, 42 C.M.R. 970 (A.F.C.M.R.1970), both citing a rule of statutory (regulatory) construction that doubt as to the meaning of a punitive regulation should be resolved in favor of an accused.

2. While "policy makers" write statutes and regulations, when they are ambiguous, it is the function of appellate courts to interpret them.

identifying drug abusers[3] or voluntary requests for "drug treatment *and* rehabilitation from drug dependency" made by Air Force members themselves.[4]

The original Deputy Secretary of Defense Memorandum (complete with a reference to Presidential guidance) that resulted in the creation of the Air Force Drug Abuse Program was in effect at the time of the operative facts in the instant case. On occasions such as this, calling for interpretation of specific aspects of this program, it certainly bears repeating:

### THE DEPUTY SECRETARY OF DEFENSE

### WASHINGTON, D. C. 20301

7 JUL 1971

MEMORANDUM FOR Secretaries of the Military Departments

Chairman, Joint Chiefs of Staff

SUBJECT: Rehabilitation of Drug Abusers

Consistent with guidance from the President of the United States, it is the policy of the Department of Defense to encourage military members to submit themselves voluntarily for treatment and rehabilitation under the Drug Identification and Treatment Program of the Department of Defense.

Accordingly, evidence developed by, or as a direct result of urinalyses administered for the purpose of identifying drug abusers may not be used in any disciplinary action under the Uniform Code of Military Justice or as a basis for supporting, in whole or part, an administrative discharge under other than honorable conditions. Similarly, a military member may not be subject to disciplinary action under the Uniform Code of Military Justice or to administrative action leading to a discharge under other than honorable conditions for drug use solely because he has volunteered for treatment under the Drug Identification and Treatment Program of the Department of Defense.

This policy does not exempt military members from disciplinary or other legal consequences resulting from violations of other applicable laws and regulations, including those laws and regulations relating to the sale of drugs or the possession of significant quantities of drugs for sale to others, if the disciplinary action is supported by evidence not attributed to a urinalysis administered for identification of drug abusers and not attributable solely to their volunteering for treatment under the Drug Identification and Treatment Program of the Department of Defense.

This policy is effective immediately and steps should be taken to insure its complete understanding and immediate compliance within the Armed Forces.

/s/ DAVID PACKARD

The Drug Identification and Treatment Program of the Department of Defense cited throughout this memorandum referenced a program created by DoD Directive 1300.-11, dated 23 October 1970, that was published in the Federal Register at 35 FR 16974, on 4 November 1970. This directive, although canceled by subsequent publication

---

3. Exemption from prosecution based on information resulting from involuntary urinalyses is authorized and mandated within the Armed Forces by Department of Defense (DoD) Instruction 1010.1, dated 4 April 1974, as modified by Deputy Secretary of Defense Memoranda dated 7 January 1975 and 28 December 1981, both *infra*.

4. Exemption from prosecution based on information resulting from voluntary requests for drug treatment and rehabilitation from drug dependency made by Air Force members has, since 25 August 1980, been authorized by DoD Directive 1010.4, entitled ALCOHOL AND DRUG ABUSE BY DOD PERSONNEL. Prior to that date it was authorized by DoD Directive 1300.11, dated 23 October 1970, and entitled ILLEGAL OR IMPROPER USE OF DRUGS BY MEMBERS OF THE DEPARTMENT OF DEFENSE. This latter directive is currently printed at 32 C.F.R. 62.4(j). The exemption has also been mandated from 7 July 1971 through 28 December 1981 by Deputy Secretary of Defense Memorandum, dated 7 July 1971, as modified by Deputy Secretary of Defense Memorandum, dated 7 January 1981, and since 28 December 1981, by Deputy Secretary of Defense Memorandum, dated 28 December 1981. All referenced documents are quoted, *infra*.

of DoD Directive 1010.4, on 25 August 1980,[5] is still printed in the Code of Federal Regulations at Title 32, National Defense; Chapter I, Office of the Secretary of Defense; Part 62, ILLEGAL OR IMPROPER USE OF DRUGS BY MEMBERS OF THE DEPARTMENT OF DEFENSE. Its first paragraph states:

> This part establishes Department of Defense policies for preventing and eliminating drug abuse by personnel of the Department of Defense and for restoring members of the Armed Forces so involved to useful functions.

32 C.F.R. 62.1.

It is this DoD Directive (1300.11) that initially authorized the various Armed Forces to establish, within well defined limits, the drug amnesty programs mandated by the Packard Memorandum, the Air Force version of which was contained in the 1976 version of AFR 30–2 in effect at the time of the events discussed herein. In addition to clarifying certain portions of the program created by this directive, the memorandum obviously intended to mandate Armed Forces implementation of the following, otherwise optional, provisions of that directive:

> The Department acknowledges a particular responsibility for counseling and protecting members of the armed forces against drug abuse, for disciplining members who use or promote the use of drugs in an illegal or improper manner, and for attempting to restore and rehabilitate members using drugs who evidence a desire and willingness to undergo such restoration.

32 C.F.R. 62.4(a)(1).

> *The Military Departments are authorized on a trial basis to establish amnesty programs.*
>
> (1) Under this program individuals shall be informed that:
>
> (i) Medical assistance will be made available.
>
> (ii) Action under the UCMJ may be suspended for the unauthorized use of drugs against a person who is sincere in

seeking help to eliminate his drug dependence, and who voluntarily comes forward before he is apprehended or detected as a drug abuser.

> (iii) If the degree or type of drug involvement precludes rehabilitation and restoration to full duty, a discharge under honorable conditions shall be considered.
>
> (iv) In recognition of an individual's personal moral responsibility for his actions and their consequences, and in evidence of his sincerity, a grant of amnesty shall stipulate the member's full cooperation in his own rehabilitation. [Emphasis in original.]

32 C.F.R. 62.4(j).

Congress apparently expressed its approval of both the DoD Directive and the subsequent Presidentially inspired Packard Memorandum regarding its implementation, when, on 28 September 1971, it enacted the following legislation:

> (a) The Secretary of Defense shall prescribe and implement procedures, utilizing all practical available methods, and provide necessary facilities to (1) identify, treat, and rehabilitate members of the Armed Forces who are drug or alcohol dependent persons, and (2) identify those individuals examined at Armed Forces examining and entrance stations who are drug or alcohol dependent persons. Those individuals found to be drug or alcohol dependent persons under clause (2) of the preceding sentence shall be refused entrance into the Armed Forces and referred to civilian treatment facilities.
>
> (b) The Secretary of Defense shall report to Congress within 60 days after the date of the enactment of this act with respect to (1) the plans and programs which have been initiated to carry out the purposes of subsection (a) of this section, and (2) such recommendations for additional legislative action as he deems necessary to combat effectively drug and alcohol dependence in the Armed Forces and to treat and rehabilitate effectively

---

**5.** *See* Paragraph F, DoD Directive 1010.4, quoted in the text, *infra*, and note 11.

any member found to be a drug or alcohol dependent person.

Pub.L. 92–129, Title V, Section 501, 28 September 1971, 85 Stat. 361.

A significant modification to the exemption policy enunciated in the Packard Memorandum was effected on 7 January 1975, by publication of a Memorandum from Deputy Secretary of Defense, W. P. Clements, bearing that date. Based upon the opinion of the United States Court of Military Appeals in *United States v. Ruiz*, 23 U.S.C. M.A. 181, 48 C.M.R. 797 (1974), this memorandum, after referencing the effect of the *Ruiz* case on previous exemption policy, mandated the following:

> ... The revised Department of Defense exemption policy is enunciated below.

> Evidence developed by, or as a direct or indirect result of urinalyses administered for the purpose of identifying drug users may not be used in any disciplinary action under the Uniform Code of Military Justice or as a basis for characterizing a member's discharge as other than an honorable discharge. Similarly, a military member may not be subject to disciplinary action under the Uniform Code of Military Justice or to an administrative action leading to a discharge other than an honorable discharge for drug use solely because he has volunteered for treatment under the drug identification and treatment programs of the Department of Defense.

> This policy does not exempt military members from disciplinary or other legal consequences resulting from violations of other applicable laws and regulations, including those laws and regulations relating to the sale of drugs or the possession of significant quantities of drugs for sale to others, if the disciplinary action is supported by evidence not attributed to a urinalysis administered for identification of drug abusers and not attributable solely to their volunteering for treatment under the drug identification and treatment programs of the Department of Defense.

This exemption policy is effective immediately. Steps will be taken to insure its complete understanding and immediate compliance within the Armed Forces.

W. P. CLEMENTS, JR.<br>Deputy

Deputy Secretary of Defense Memorandum, dated 5 January 1975

Finally, with respect to this survey of documentation delineating the DoD Drug Rehabilitation and Treatment Program in existence at the time of this case's operative facts, I set forth a portion of Enclosure 7 attached to a Deputy Secretary of Defense Memorandum dated 11 July 1978. Entitled IMPROVED MEASURES FOR DRUG ABUSE IDENTIFICATION, it required immediate field implementation by each Armed Force.

> The drug abuse situation in the military services continues to cause serious concern regarding its effect on the health of servicemembers involved as well as its effect on the readiness of individuals to perform at the optimum level.

> Drug abuse education programs have been expanded and improved. Treatment and rehabilitation programs are in place and operating and they improve as time goes on and more is learned. There are also disposition channels for drug abusers who cannot or will not be rehabilitated. However, the functional area in which the military services can realize a greater return in combatting drug abuse is that of drug abuse identification.

* * * * * *

> Accordingly, it is desired that each service reexamine its current drug abuse identification practices and programs to insure that all avenues whereby drug abusers are detected are operating at maximum effectiveness. Specifically, each service is enjoined to accomplish the following:

> a. Increase the awareness of the individual servicemember of the exemption policy (described in reference b. [the Clements Memorandum, quoted, *infra*]) whereby a drug abuser may seek help without fear of adverse punitive action.

* * * * * *

c. Assure that drug abusers detected through the exercise of military medical, law enforcement, and investigative agency functions are brought to the attention of the drug abuser's commander or supervisor so that the necessary confirmatory, rehabilitative or other actions may be taken.

d. Assure that drug abusers detected by civil authorities are referred to commanders or supervisors for appropriate action.

e. Increase use of urinalysis. Consideration should be given to periodic urinalysis sweeps of entire units as well as to commander and physician directed urinalysis of suspect individuals.

\*    \*    \*    \*    \*    \*

In addition to the commander, physician and unit testing discussed above, the programs to implement all other forms of urinalysis (except random) described in Enclosure 1 to reference a [DoD Instruction 1010.1], should be strengthened where necessary.

Deputy Secretary of Defense Memorandum, dated 11 July 1978, Enclosure 7.

From this review of documents in existence at the time the operative facts in this case occurred, it is apparent that AFR 30–2,[6] purported to create certain *ultra vires* exemptions from prosecution which far exceeded the intended parameters of the then existing DoD Drug Identification and Treatment Program.

Unquestionably, AFR 30–2 had, from time to time, since its initial publication in 1974, been modified to clarify its objectives and improve its operational effectiveness.

Nevertheless, despite the six and one-half years of its existence at the time medical treatment was rendered in the instant case, some required modifications had yet to be made.

As an example, the original AFR 30–2 and all subsequent changes to it, through and including the ones published on the date of concern to us here, failed to indicate that prior to qualifying for the "amnesty" from prosecution authorized by DoD Directive 1300.11 or the "exemptions" from prosecution authorized by the Packard and subsequently the Clements Memoranda, an Air Force member had to be "sincere in seeking help to eliminate his drug dependence", *see* 32 CFR 62.4(j), quoted *supra.*

Although this error has subsequently been recognized by Air Force "policy makers",[7] their failure to earlier note such a glaring omission resulted in several thousand inadvertent *de facto* grants of exemption from prosecution to personnel who could and should have been prosecuted for drug offenses.

The instant omission that causes the confusion in paragraph 4–24 is no less apparent.

Simply stated, under the DoD Drug Identification and Treatment Program, in order to qualify for exemption from prosecution based upon incriminating information revealed incident to medical care, a member of the Armed Forces must, at the time medical treatment was sought in the instant case, have been "sincere in seeking . . . [such medical care] to eliminate his drug dependence."[8]

---

**6.** AFR 30–2 was the Air Force Regulation which, on 1 August 1974, initially implemented both DoD Directive 1300.11 and the subsequent Presidential guidance concerning this directive mandated by Mr. Packard's memorandum of 7 July 1971. Although reissued only once, on 8 November 1976, prior to the events culminating in this case, numerous interim changes had been issued both before and after its 8 November 1976 edition.

**7.** The discrepancy was finally recognized by Interim Message Change 81–2, dated 8 October 1981, to the second total revision of AFR 30–2, which had been published on 22 June 1981. As indicated *infra*, in the text, this change, for the first time, added the missing DoD drug dependency requirement to the Air Force version of the DoD drug amnesty program as contained in the Air Force's implementing regulation. It was issued subsequent to a restatement of DoD policy in the form of a new drug identification and treatment directive, DoD Directive 1010.4, dated 25 August 1980, that rescinded DoD Directive 1300.11. *See also*, quotations from DoD Directive 1010.4, *infra.*

**8.** 32 CFR 62.4(j), quoted, *supra.*

While the Secretarial Memoranda, dated 7 January 1975 and 11 July 1978 that updated the basic Program did not specifically reiterate this fundamental requirement, neither did they delete it. To the contrary, Enclosure 7 to the 11 July 1978 Memorandum specifically required that any incriminating drug information revealed incident to medical care be handled in a manner identical to such information detected by "law enforcement and investigative agency functions." [9]

Nevertheless, when the medical treatment at issue in this case was sought, the language contained in paragraph 4–24, AFR 30–2, appeared to create an entirely separate exemption from drug prosecution for any servicemember disclosing information regarding personal drug abuse, incident to requested medical care rendered for any purpose. Despite the language of DoD Directive 1300.11, despite the language of the various Secretarial Memoranda quoted, *supra,* and despite the absence of a physician/patient privilege under the then existing Military Rules of Evidence, paragraph 4–24's silence as to any requirement that service members be "sincere in seeking . . . to eliminate . . . drug dependence" before qualifying for the exemption which it offered, appears to have precluded any contrary interpretation.

The then existing language of both the paragraph and the regulation, whether by accident or design, greatly expanded the scope of any "exemption from prosecution" authorized and mandated by the Department of Defense.

The Court of Military Appeals, when confronted by an almost identical situation in *United States v. Voorhees,* 4 U.S.C.M.A. 509, 16 C.M.R. 83 (1954), found that limitations contained in a DoD Directive, which the Armed Forces were mandated to imple-

ment by a subsequently issued Secretary of Defense Memorandum, are imputed to Armed Forces regulations implementing such a directive, regardless of their otherwise vague or even contradictory language.[10]

Unlike the situation in *Voorhees, supra,* however, were we to apply this principle to the instant case, it would not operate to the benefit of the accused. Consequently, I am constrained, before reaching a conclusion, to examine other applicable rules of statutory (regulatory) construction.

In addition to the rule alluded to by the Senior Judge, concerning resolution of doubt as to a regulation's meaning in favor of an accused (*see,* note 1, *supra*), I am compelled to examine that rule which requires an appellate court to consider the intent of the whole and every part of a regulation, before interpreting any of its integral parts.

A statute should be interpreted in a manner that will render it consistent or in conformity with its general scope or purview. Courts may not, ordinarily, regardless of merit, extend a statute to meet cases not within its purview. Indeed, "the general purview of a statute may control the literal meaning of a particular provision." [Citations omitted.]

*United States v. Baker,* 18 U.S.C.M.A. 504, 40 C.M.R. 216, 219 (1969).

A literal reading of paragraph 4–24, AFR 30–2 (quoted verbatim in the lead opinion), indicates that any information an Air Force member reveals concerning his personal use of drugs or his possession of drugs incident to such use, cannot be used to support punitive action, if it is revealed incident to medical treatment he has requested for *any* purpose.[11]

---

9. *See* paragraph c of Enclosure 7 to Deputy Secretary of Defense Memorandum, dated 11 July 1978, quoted, *supra.*

10. *See also,* Judge Cook's opinion, concurring with reservation, in *United States v. Morris,* 12 M.J. 262, 264 (C.M.A.1982).

11. Obviously, the clause reading "which concerns the members use of drugs or possession incident to personal use of drugs" modifies the phrase "Information about, or evidence of, drug abuse," not "medical treatment requested by a member." One cannot receive medical treatment for possession incident to personal use of drugs.

Although it is the only provision in the entire regulation, other than that relating to involuntary urinalysis authorized by DoD Directive 1010.1 (see, note 3, supra), that purports to grant amnesty to individuals who do not specifically request both treatment and rehabilitation for drug abuse, it is contained in the same section (the section dealing with methods of identifying drug abusers), as is the provision on involuntary urinalysis.

Where, as here, a paragraph of an Armed Force's regulation fails, for whatever reason, to express the intent and specific substance of a superior regulation it is designed to implement, and it is not apparent from the Armed Force's regulation that the paragraph is beyond the purview of that regulation, a member of that Armed Force should, regardless of the rationale of *United States v. Voorhees, supra*, be entitled to rely upon its language. Consequently, the Government should, in this case, have been prohibited from using the incriminating drug information gained as a result of medical care it rendered to the accused.

### III

Like my brothers, I, too, would set aside the accused's conviction as to Charge IV, in addition to that of Charge V. As acknowledged in note 4 of the lead opinion, Charge IV was based upon marihuana discovered in the accused's barracks room, pursuant to a search warrant issued by the base commander. It was issued on the night the accused received the instant medical treatment for use of Lysergic Acid Diethylamide.

Unlike my brothers, however, I would not restrict this finding to the facts of the instant case. The language of paragraph 4-24 extends its exemption to the "fruits" of information revealed incident to medical care, just as clearly as it does to the revealed information itself. A commander's

use of this "privileged" information as justification for his authorization to search an accused's quarters will always taint the results of such a search:

... Evidence of drug abuse that is revealed incident to medical treatment, which concerns the member's use of drugs ... may not be used in whole or in part to support punitive action.

AFR 30-2, paragraph 4-24.

### IV

Also, before closing, I must, in good conscience, expound upon an area of judicial concern ignored by my brothers; to wit: this Court's duty to impartially oversee the proper operation of military justice in the United States Air Force. In my view, if after having noted in this opinion that AFR 30-2, paragraph 4-24, creates an *ultra vires* exemption from prosecution for Air Force members who violate the Uniform Code of Military Justice in direct contravention of a DoD program effectively preempting the area of such exemptions, I fail to take action which would, henceforth, render that paragraph null and void, I would shirk this duty.

Before addressing this remaining problem, I must, of course, ascertain its continued existence by extending my historical research of the DoD Drug Identification and Treatment Program and the Air Force's implementation of it, to the present.

On 25 August 1980,[12] DoD published a revised directive entitled ALCOHOL AND DRUG ABUSE BY DOD PERSONNEL which, while specifically rescinding DoD Directive 1300.11, retained the basic concepts of that Directive. In pertinent part, this still current Directive provides:

SUBJECT: Alcohol and Drug Abuse by DoD Personnel

References: (a) Public Law 92-255 (86 Stat 65), as amended

(b) Public Law 91-616 (84 Stat 1848), as amended

---

12. Paragraph F, DoD Directive 1010.4, ALCOHOL AND DRUG ABUSE BY DOD PERSONNEL, dated 25 August 1980, indicates Armed Forces implementation of the Directive was not required until 23 December 1980. Coinciden-

tally, the incident of medical care rendered under the facts of the instant case occurred on 23 December 1980, just prior to the required implementation.

(c) Public Law 92–129 (85 Stat 361), as amended

(d) Federal Personnel Manual Supplement 792–2, Feb 1980

(e) through (i). see enclosure 1

A. PURPOSE

1. This Directive states the DoD alcohol and drug abuse prevention policy, and implements the standard contained in references (a) through (d).

\* \* \* \* \* \*

B. APPLICABILITY

The provisions of this Directive apply to the Office of the Secretary of Defense, the Military Departments, the Organization of the Joint Chiefs of Staff, the Unified and Specified Commands, and the Defense Agencies. The term "Military Services" includes the Army, Navy, Air Force, and Marine Corps.

C. DEFINITIONS

The following definitions are for operational use within the Department of Defense. They do not change definitions in statutory provisions and those regulations and directives that are concerned with determination of misconduct and criminal or civil responsibilities for persons' acts or omissions.

\* \* \* \* \* \*

3. *Alcohol and Drug Dependence.* The reliance on alcohol and/or other drugs following administration on a periodic or continuing basis. Dependence may be psychological or physical, or both.

a. *Psychological Dependence.* The craving for the mental or emotional effects of a drug that manifests itself in repeated use and leads to a state of impaired capability to perform normal functions.

b. *Physical Dependence.* An alteration or state of adaption to a drug after repeated use that results in withdrawal symptoms when the drug is discontinued abruptly and/or the development of tolerance.

\* \* \* \* \* \*

D. POLICY

1. It is the goal of the Department of Defense to be free of the effects of alcohol and drug abuse; of the possession of and trafficking in illicit drugs by military and civilian members of the Department of Defense; and of the possession, use, sale, or promotion of drug abuse paraphernalia. Alcohol and drug abuse is incompatible with the maintenance of high standards of performance, military discipline, and readiness. Therefore, it is the policy of the Department of Defense to:

\* \* \* \* \* \*

c. Deter and detect alcohol abuse within the Armed Forces and defense community and drug trafficking on installations and facilities under the control of the Department of Defense.

d. Provide continuing education and training to commanders, supervisors, program personnel, and other military members and civilian employees and their families concerning this policy and effective measures to alleviate problems associated with alcohol and drug abuse.

e. Treat or counsel alcohol and drug abusers and rehabilitate the maximum feasible number of them.

f. Discipline and/or discharge drug traffickers and those alcohol and drug abusers who cannot or will not be rehabilitated, in accordance with appropriate laws, regulations and instructions.

\* \* \* \* \* \*

3. Programs and standards of care promulgated in execution of this policy for military personnel shall be in compliance with P.L. 92–129 (reference (c)). [Public Law 92–129 is quoted, *supra.*]

\* \* \* \* \* \*

E. RESPONSIBILITIES

\* \* \* \* \* \*

2. The *Secretaries of the Military Departments and Directors of Defense Agencies* shall establish and operate programs prescribed by this Directive and supporting DoD instructions. They may make exceptions to the policy contained in this Directive only for legitimate medi-

cal, educational, and operational purposes. This authority shall not be delegated.

\* \* \* \* \* \*

### F. EFFECTIVE DATE AND IMPLEMENTATION

This Directive is effective immediately. Forward two copies of implementing documents to the Assistant Secretary of Defense (Health Affairs) within 120 days. Department of Defense Directive Number 1010.4, August 25, 1980.

Then on 28 December 1981, a new Deputy Secretary of Defense Memorandum, which rescinded Deputy Secretary of Defense Memoranda, dated 7 July 1971, 7 January 1975, and 11 July 1978, *all supra*, as well as Section IV.a.3., DoD Instruction 1010.1, *supra* at n.3, was promulgated. I quote:

### THE SECRETARY OF DEFENSE

### WASHINGTON, D. C. 20301

DEC 28 1981

MEMORANDUM FOR Secretaries of the Military Departments

Directors of the Defense Agencies

SUBJECT: Alcohol and Drug Abuse

References: (a) through (h) (Enclosure 1).

(i) DoD Directive 1010.4, Alcohol and Drug Abuse by DoD Personnel

Alcohol and drug abuse by members of the armed forces is a continuing problem that has an adverse impact on military readiness. Various surveys have demonstrated the serious nature of this problem. We must take immediate action to reduce the effects of drug and alcohol abuse on our forces.

Previous issuances on alcohol and drug abuse (references (a) through (h)) are rescinded or modified as provided in Enclosure 1. This action eliminates the prohibition against use in disciplinary proceedings of evidence obtained from compulsory urinalysis as provided in Enclosure 2 to this memorandum. The Assistant Secretary of Defense (Health Affairs) will promulgate a DoD Instruction incorporating those policies contained in references

(a) through (h) that are consistent with this memorandum, and such other matters as are necessary to fulfill the objectives of this memorandum and DoD Directive 1010.4 (reference (i)). This memorandum is rescinded upon issuance of the Instruction by the Assistant Secretary of Defense (Health Affairs).

Department of Defense policies have been designed to attack successfully the problem of drug and alcohol abuse. The tools needed to complete this task are available to the military departments. Please insure that drug and alcohol abuse control continues to receive emphasis, with specific attention to the problem of on-duty abuse.

/s/

Frank C. Carlucci

Deputy Secretary of Defense

Enclosures

In essence, the two DoD mandates issued subsequent to the facts upon which the instant case was decided have both decreased the circumstances under which the Armed Forces are authorized to grant exemptions from prosecution for drug offenses and tightened the preemptive nature of the Department's dictates in the field.

The basis of the authorized exemptions has changed from DoD Directive supported by Secretarial Memoranda, to Public Law supported by DoD Directive and Secretarial Memoranda. But, an established drug dependency, be it physical or psychological, remains at the heart of all authorized exemptions from drug prosecution other than those based upon the urinalysis provisions of DoD Instruction 1010.1. And, significantly, even the scope of exemptions authorized under this latter Instruction, relating to urinalysis, has been severely limited.

Based upon this complete historical analysis of the DoD Drug Identification and Treatment Program, it is clear to me that despite the 25 August 1980 cancelation of DoD Directive 1300.11, the 28 December 1981 cancelation of the Deputy Secretary of Defense Memoranda, dated 7 July 1971, 7 January 1975, and 11 July 1978, and the 28 December 1981 modification of DoD In-

struction 1010.1; the successors to these documents, to wit, DoD Directive 1010.4, [citing Public Law 92–129], DoD Instruction 1010.1, as modified, and the Deputy Secretary of Defense Memorandum, dated 28 December 1981, continue to preempt the Secretaries of the various Armed Forces from granting any exemptions from prosecution to drug abusers other than those specifically mandated within those documents.

Turning my attention to the history of AFR 30–2 since 23 December 1980, I discover that despite a flurry of activity designed to belatedly bring the Air Force Drug Program back into conformity with the DoD Program (apparently generated by the new enunciation of that program's fundamental elements contained in those regulatory changes just discussed), the current paragraph relating to identification of drug abusers incident to medical care remains substantially unchanged.

Although a complete revision of AFR 30–2 was published on 22 June 1981, no significant changes regarding existing "exemptions from prosecution for drug offenses" were effected until publication on 8 October 1981 of Interim Message Change 81–2. It was this change that recognized, for the first time, that Air Force members must, in fact, have a drug dependency requiring rehabilitation and treatment before they can qualify for exemptions from prosecution based upon self-initiated requests for such rehabilitation and treatment.

Despite a third Interim Change to the regulation, published on 24 November 1981, however, AFR 30–2's current paragraph regarding identification of drug abusers, retains essentially the same language as the paragraph we interpreted in this case (paragraph 4–24 of the regulation's 1976 version). The new language follows:

> *Incident to Medical Care.* When drug or alcohol abuse is discovered during medical treatment (requested by the member), the information obtained can only be used to support an honorable discharge if separation becomes necessary. Information so obtained cannot be used to support a general discharge or a discharge under other than honorable conditions. Evidence of drug use detected during emergency treatment may be used for punitive actions under the appropriate circumstances, or administrative separation action without restriction on discharge characterization. However, this paragraph does not exempt the member from disciplinary or other legal consequences resulting from violations of other laws or regulations such as the sale or transfer of drugs or possession for such purposes.

Paragraph 4–2b, Air Force Regulation 30–2, Social Actions Program, dated 22 June 1981.

Consequently, the same problem that has required us, in this case, to apply an estoppel theory to uphold the validity of a clearly *ultra vires* Air Force regulatory provision continues to exist, *albeit*, in an exacerbated form. Although every other provision in the current AFR 30–2 dealing with non-urinalysis exemptions from prosecution now requires a member to be drug dependent before he can qualify for drug rehabilitation and treatment with its accompanying exemption from prosecution, paragraph 4–2b continues to extend an exemption to anyone who first discusses drug violations with an Air Force physician incident to any type of medical care he requested.

As a judge on the Air Force Court of Military Review, I believe I am charged with overseeing the proper operation of military justice within the United States Air Force.[13] Because I perceive this responsibility as separate and distinct from my more traditional function of resolving specific issues as they apply to a particular case, I would, regardless of the "ripeness" of this issue,[14] find that paragraph 4–2b of

---

**13.** Query: If the Courts of Military Review of the respective services are unable or unwilling to fulfill this "watchdog" function, in whom does the function repose?

**14.** Arguably, the holding of this case should be restricted to the language of paragraph 4–24. Since we are not presented with the new version of this paragraph (paragraph 4–2b), it would follow that we should not recognize the

the current edition of AFR 30–2 is null and void because it directly conflicts with the superior DoD Directives cited and discussed, *infra.*

Applying a doctrine of fundamental fairness, I would recognize this court's continuing obligation to estop the government's use of any drug information that is revealed by Air Force members incident to medical care rendered by Air Force physicians up to and including twenty-nine days following the publication date of this decision. I would emphatically conclude, however, that any such effect of the henceforth null and void language of paragraph 4–2b would be inoperative as to any information revealed by Air Force members incident to medical care rendered 30 or more days following the notice resulting from publication of this decision.

existence of the continuing problem it repre-