**UNITED STATES, Appellee**

v.

**Charles D. JACOBS, Technical Sergeant U.S. Air Force, Appellant.**

No. 95–0328.
Crim.App. No. 30368.

U.S. Court of Appeals for
the Armed Forces.

Argued Jan. 5, 1996.

Decided Aug. 29, 1996.

For Appellant: *Captain Harold M. Vaught* (argued); *Colonel Jay L. Cohen* (on brief); *Captain Robert E. Watson.*

For Appellee: *Lieutenant Colonel Michael J. Breslin* (argued); *Colonel Jeffery T. Infelise* (on brief).

*Opinion of the Court*

GIERKE, Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary* to his pleas, of introducing marijuana onto a military aircraft with the intent to distribute (2 specifications), and of introducing methamphetamine onto a military aircraft with the intent to distribute, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. The adjudged and approved sentence provides for a dishonorable discharge, confinement for 13 years, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion.

Our Court granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRED WHEN HE RULED THAT THE ORAL STATEMENT PROVIDED BY STAFF SERGEANT MARK A. LAWRENCE TO THE AIR FORCE OFFICE OF SPECIAL INVESTIGATIONS WAS ADMISSIBLE AS A DECLARATION AGAINST INTEREST AND THAT THE STATEMENT CONTAINED SUFFICIENT GUARANTEES OF TRUSTWORTHINESS TO SATISFY THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT.

The granted issue concerns only specification 1 of the Charge, alleging that appellant introduced 106.17 pounds of marijuana onto a military aircraft in the Philippines. Staff

* General Court–Martial Order No. 1 erroneously reflects the plea to the Charge.

**302**

Sergeant (SSgt) Lawrence, who received the shipment, was in a Japanese prison unable to travel to the Philippines for appellant's court-martial. Appellant concedes that SSgt Lawrence was unavailable. Final Brief at 9. Lawrence's statement was admitted as a declaration against penal interest under Mil. R.Evid. 804(b)(3), Manual for Courts–Martial, United States (1995 ed.).

Appellant's court-martial took place before the Supreme Court's decision in *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). The Court of Criminal Appeals decision was rendered 4 months after *Williamson* but does not address it. We will remand for further consideration in light of *Williamson*.

### Factual Background

SSgt Kinley testified that appellant telephoned him on November 2, 1989, looking for a buyer of marijuana and methamphetamine. When Kinley asked appellant how he intended to get the marijuana to Japan, appellant responded that "it was already there." Kinley was working undercover for the Air Force Office of Special Investigations (OSI) at the time. On November 3, Kinley called appellant, who said he had 60 kilograms of marijuana. Appellant offered Kinley 10% of the proceeds if he found a buyer.

Kinley called appellant later on the same day and said he had a buyer. They decided that Kinley would use the code name "Christie" in arranging the sale and delivery of the marijuana. Appellant initially identified the person who was holding the marijuana as "M," but he inadvertently revealed his name as "Mark," later identified as SSgt Mark Lawrence. Kinley asked, "Well, is M cool?" Appellant responded, "No." Kinley asked "if M had the marijuana," and appellant responded, "Well, he looks at it every morning when he wakes up." Kinley left a message for Mark on an answering machine, telling him to contact appellant. Later, he told appellant about leaving the message.

On November 4, Lawrence and Kinley arranged for transfer of the 60 kilos of marijuana. Kinley obtained a van and met Lawrence at the Fussa Train Station at about 1:00 p.m. Lawrence took the van and agreed to meet Kinley with the marijuana in a parking lot behind a night club two or three blocks from the train station. Lawrence arrived at the meeting place within a few minutes. Kinley saw the boxes covered with a blanket in the van. Lawrence turned over the loaded van to Kinley, and they agreed that Kinley would package up the money and contact Lawrence before he left "in a couple of days."

At that point OSI Special Agent (SA) Carroll blocked the exit from the parking lot, identified himself, ordered them to stop, and grabbed Lawrence. Lawrence broke away from SA Carroll and fled.

Sometime during the early afternoon of November 5, Lawrence called the Security Police and said he wanted to turn himself in. He went to the rear gate at Yokota Air Base, where he was picked up by the Security Police and transported to the OSI office. He was not apprehended.

At the OSI office Lawrence was interviewed by SA Carroll, who had tried to apprehend him on the previous day. SA Carroll was assisted by SA Keller. SA Carroll recognized Lawrence from the previous day's encounter and noticed that he was wearing the same clothes as the previous day. SA Carroll described the atmosphere in the interview room as "very relaxed."

SA Carroll advised Lawrence of his rights under Article 31, UCMJ, 10 USC § 831, and his right to an attorney, and told him he was suspected of "use, possession, distribution, ... smuggling of a controlled substance, conspiracy to smuggle a controlled substance, and resisting apprehension." Lawrence waived his rights. SA Carroll testified that "there was a strong possibility" that he told Lawrence that if he cooperated "the proper people" would be informed of his cooperation.

During the interview, which lasted about an hour, Lawrence made an unsworn oral statement. The agents then took a short break. When they resumed the interview, Lawrence indicated that he wanted to talk to a lawyer, and the agents terminated the interview. Before the court members SA Car-

roll related Lawrence's oral statement as follows:

He stated that he had PCSd [transferred] up to Yokota Air Base from Clark on 19 May 89. Shortly thereafter, he proceeded back to Clark Air Base [Philippines] where he was TDY [on temporary duty] staying at the Jet Hotel.

While in the Jet Hotel one evening while watching TV, a black male had entered the bar. He described him as about five nine, five ten, 160, 70 pounds. He was with a Filipino national who identified himself as "Lotus." The black male came over to the table, identified himself as "Jake Jacobson," and they sat down, began a conversation where this individual, Jake Jacobson, had stated that he was being reassigned to Yokota Air Base [Japan] and that he was going to be overweight in his household goods, and he asked Sergeant Lawrence if he sent some stuff up to him, would he hold on to it for him until he PCSd or was reassigned to Yokota, which Sergeant Lawrence agreed.

\* \* \*

It was then the July or August time frame. After going back to Yokota, he had received a phone call from an individual now identifying himself as "Bradshaw," which ... he said this was the same individual that he had talked to at the bar.

\* \* \*

The individual stated that he had the boxes—five moving boxes on a flight enroute now—or coming to Yokota, and would he pick them up.... Sergeant Lawrence noticed the boxes there at his duty section, and he proceeded to take those boxes to his residence.

\* \* \*

Well, initially, he just placed them in his house and, after several TDYs back to Clark Air Base in an attempt to get ahold of this Jake Jacobson/Bradshaw, he was unable to get ahold of him.

Something that I forgot to mention was when he did pick up the boxes at the organization, the caller had stated—identified himself, again, as "Bradshaw," and when he picked up the boxes, there was masking tape on the boxes with the name of "Bradshaw" on all the boxes.

Going back now. He attempted to find this individual to ask him when he was coming to pick up the boxes on two occasions during TDYs to Clark. On a third occasion, on September 89 while he was TDY to Clark, again, staying at the Jet Hotel, he had come in contact with Jake again.

During the second and third occasion, though, Sergeant Lawrence had opened up one of the boxes due to him not being able to get ahold of the accused, or this Jake/Jacobson/Bradshaw. He opened the boxes and found out that they contained two jugs. He proceeded to open up one of the jugs, discovering that it contained marijuana, at which point in time, he took some out for his own use and placed it in a camera bag. Then he resealed the jugs with some sealant he took from the aircraft maintenance unit and then resealed the box that he took the marijuana from.

He had told this individual on the telephone that he had opened up the box and he knew what was in it, at which point in time, the individual said "Leave it alone. Don't mess with it. I[sic] doesn't belong to me. It belongs to the Japanese."

SA Carroll asked Lawrence where he was on Friday, November 4, 1989, and Lawrence responded as follows:

He stated that he had ended up smoking some of the marijuana that evening and went down to Rapongi, which is a night club district in Tokyo. He didn't come back till 3:00 or 4:00 o'clock the next morning, at which point in time he checked the answering machine and there was a message there from Christie telling him to contact Jake.

He stated that he attempted to contact Jake and he couldn't get a hold of him. So he went to bed. The next morning there was a message on it from Jake to contact

him. So he attempted to contact Jake, wasn't able to get ahold of him. Then Jake had called him. This was in-between the phone calls by Christie, or Sergeant Kinley that we had placed.

After talking to the accused, the accused told him that it was payday and to go ahead and work out the arrangements with Christie to deliver it.

According to SA Carroll, Lawrence described the delivery arrangements as follows:

He stated that—for Sergeant Kinley to, again, meet him there at the Fussa Train Station at approximately 1:00 o'clock, at which point in time he'd take the van, go get the marijuana, and bring it to him and transfer it to him.

He described in detail to us that he met the black male there at the Fussa Train Station. He walked up to him, took the van, proceeded to his residence where he removed the five boxes, which were in an extra bedroom, but he stated he had moved them to the front door, placed them in the van, and covered them with a blue blanket.

He proceeded then back to Eddie's—Eddie's Bar location in an alley there where he was supposed to meet with Sergeant Kinley to do the transfer.

The prosecution offered Lawrence's statement as a declaration against penal interest under Mil.R.Evid. 804(b)(3), and the military judge admitted it as such. The military judge made the following findings of fact and conclusions of law:

Now, in evaluating in whether Staff Sergeant Lawrence's statement was a declaration against his penal interest, I considered whether or not it was damaging to him, and if it was of such a nature or character that he wouldn't have made it unless it were true.

Now the factors I considered were as follows. On 4 November 1991, he was apprehended—or under apprehension as he was attempting to deliver over 100 pounds of marijuana to Kinley. He was identified by the apprehending official, seen clearly, and held up against a wall, even though he believed the apprehending official was a Japanese when, in fact, it was an American OSI agent.

His accomplice, Kinley, was also identified and, as far as Lawrence knew, my [sic] have been apprehended. At that time or shortly thereafter, Lawrence believed that his own apprehension was imminent and inevitable.

From the 5th of November, Lawrence voluntarily turned himself in to the Security Police, I believe at a gate shack. Thereafter, he was turned over to the OSI where he was confronted by Agents Keller and Carroll. He was fully advised of his rights under Article 31 of the Uniform Code of Military Justice and the offenses of which he was suspected of committing were fully delineated to him.

.  *  *  *

During the interview by the agents, Lawrence freely admitted, without reference to any statements made by persons accusing him of crime, that he had used and possessed a large quantity of marijuana in his apartment. He didn't use a large quantity, but he possessed a large quantity; that he took his own stash from the large quantity of marijuana and put it in a camera bag. He also admitted to conspiring to distribute the marijuana with Kinley, and attempting to distribute the marijuana to Kinley pursuant to the conspiracy.

Finally, I conclude that Staff Sergeant Lawrence did not attempt to shift blame or responsibility to the accused or Kinley in that he admitted, voluntarily, his own use, creating his own stash and his involvement in the conspiracy with Kinley to distribute the marijuana.

*  *  *

Under these circumstances, I conclude that Staff Sergeant Lawrence's statement was a declaration against his penal interest, and I further conclude that he knew that his declaration was against his penal interest.

The defense argued that Lawrence's statement was inherently improbable. The mili-

tary judge recognized that the first part of Lawrence's statement might be "fishy" but was satisfied that the portion of the statement regarding what he did with the marijuana was reliable.

The military judge concluded that a declaration against penal interest is a firmly-rooted hearsay exception, and he announced on the record "the factors I considered in evaluating the particularized guarantees of truthfulness" in Lawrence's statement. He described the factors as follows:

In addition to the matters I enumerated earlier, I considered the fact that the statement was oral, that it was never reduced to writing and, more importantly, that it was never sworn.

In view of counsel's comments, I will comment that I did consider the possibility that the manner in which Sergeant Lawrence met the accused and the fact that he agreed to receive property from an individual he had barely met was strange and, even if it were untrue, I'm satisfied that the important portion of the statement is correct, or accurate, or honest, or true.

Now, I have no contrary evidence as to the matters he admitted to regarding how he obtained possession of the marijuana, or the circumstances here at Clark.

Now the specific factors in addition to those I just mentioned are basically the same that I enumerated as to whether the statement was against his penal interest. At the time he made the statement, he had been popped by the OSI, identified, had escaped. The accomplice apparently had suffered the same fate. He believed his own apprehension was inevitable and probably imminent, and voluntarily turned himself in to the Security Police. Most importantly, he was fully advised of his rights under the Uniform Code, and was given a thorough description of the offenses of which he was suspected.

One important aspect of his admissions in the statement was that he admitted using marijuana that was in his apartment. He admitted creating his own cache of marijuana in the camera bag, and he admitted the conspiracy to Kinley in attempting to distribute the marijuana. Only the last two could have been known by the OSI. Now, under these circumstances, I'm satisfied that there were sufficient guarantees of trustworthiness, that the Confrontation Clause is satisfied, and that the statement is admissible.

The Court of Criminal Appeals specifically held that a declaration against penal interest is admissible as a "firmly-rooted" hearsay exception. Unpub. op. at 10, citing *United States v. Wind*, 28 MJ 381, 385 (CMA 1989).

*Discussion*

Appellate defense counsel argue that a declaration against penal interest is not a "firmly-rooted" exception and that Lawrence's declarations do not possess sufficient guarantees of trustworthiness to satisfy the Confrontation Clause. The Government argues that Lawrence's declarations fall within a "firmly-rooted" exception.

If Lawrence's declarations fall "within a firmly-rooted hearsay exception," then "[r]eliability can be inferred without more." If they do not, then "the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980).

In *United States v. Dill*, 24 MJ 386 (1987), in a divided opinion, our Court said that "statements against penal interest are of recent derivation and are not 'firmly rooted' exceptions to the hearsay rule." *Id.* at 387–88 (citations omitted). Two years later, in *United States v. Wind, supra*, Chief Judge Everett spoke for the Court and wrote: "[W]e shall treat such declarations [against penal interest] as coming within a 'well established exception'; and such declarations may be admitted in evidence without the Government's offering corroboration or independent evidence as to the reliability of the declaration." 28 MJ at 385.

The underlying problem with most declarations against penal interest is that they are made by co-actors who frequently have motives to shift or minimize guilt or to gain legal advantage by agreeing to assist the prosecution. *See United States v. Koistinen,*

27 MJ 279, 282 (CMA 1988), *quoting Lee v. Illinois,* 476 U.S. 530, 541, 106 S.Ct. 2056, 2062, 90 L.Ed.2d 514 (1986) ("[A]ccusatory statements of co-actors 'have traditionally been viewed with special suspicion.'"). On the other hand, the Supreme Court observed in *Williamson v. United States,* 512 U.S. at ——, 114 S.Ct. at 2437, "that the very fact that a statement is genuinely self-inculpatory—which our reading of Rule 804(b)(3) requires—is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause."

The Supreme Court expressly declined in *Williamson* to decide if a declaration against penal interest is a "firmly-rooted hearsay exception." ("[W]e need not decide whether the hearsay exception for declarations against interest is 'firmly rooted' for Confrontation Clause purposes." 512 U.S. at ——, 114 S.Ct. at 2437.). *But see Lee v. Illinois,* 476 U.S. 530, 551 and n. 4, 106 S.Ct. 2056, 2067 and n. 4, 90 L.Ed.2d 514 (1986) (Blackmun, J., dissenting, joined by Burger, C.J., Powell and Rehnquist, JJ.) ("The hearsay exception for declarations against interest is firmly established....").

■ The federal circuits have not been unanimous, but the majority that addressed the issue have treated declarations against penal interest as "firmly-rooted" hearsay exceptions. *See United States v. Saccoccia,* 58 F.3d 754, 779 (1st Cir.1995); *Jennings v. Maynard,* 946 F.2d 1502, 1506 (10th Cir. 1991); *United States v. Taggart,* 944 F.2d 837, 840 (11th Cir., 1991); *United States v. York,* 933 F.2d 1343, 1363 (7th Cir.); *Berrisford v. Wood,* 826 F.2d 747, 751 (8th Cir. 1987); *United States v. Katsougrakis,* 715 F.2d 769, 776 (2d Cir.1983). *But see United States v. Flores,* 985 F.2d 770, 778–80 (5th Cir.1993); *Olson v. Green,* 668 F.2d 421, 428 (8th Cir.) (custodial statements implicating third person not "firmly-rooted" hearsay exception). We will follow the weight of authority and adhere to our latest pronouncement in *Wind.* Accordingly, we hold that a declaration against penal interest is a "firmly-rooted" hearsay exception.

■ This holding, however, does not end our inquiry. In *Williamson,* the Supreme Court held that each declaration within the overall statement must be analyzed, and only those declarations that are "truly self-inculpatory" may be admitted as declarations against penal interest. 512 U.S. at ——, 114 S.Ct. at 2437. Collateral statements and exculpatory declarations do not fall within the exception. The Supreme Court held that the exception for declarations against penal interest "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." 512 U.S. at ——, 114 S.Ct. at 2435. This means that a declaration must be analyzed, line by line, sentence by sentence, and only those portions of the declaration that are "truly self-inculpatory" may be admitted.

Turning to Lawrence's declarations, some of them appear on their face to be neutral or even self-exculpatory. For example, his discussion with appellant about receiving and holding household goods—evaluated by the military judge as "fishy"—appear to disclaim any part in a conspiracy to distribute marijuana as well as knowledge of the boxes' contents. Other declarations appear more inculpatory, such as Lawrence's admission that he discovered the marijuana, removed and used some of it, and arranged with Kinley to deliver it and receive the money from its sale.

The Supreme Court observed in *Williamson* that the required analysis of declarations offered under Fed.R.Evid. 804(b)(3) "can be a fact-intensive inquiry, which would require careful examination of all the circumstances surrounding the criminal activity involved." 512 U.S. at ——, 114 S.Ct. at 2437. We conclude, as the Supreme Court did in *Williamson,* that remand is necessary to determine what parts of Lawrence's statement were "truly self-inculpatory." Furthermore, if any parts are not "truly self-inculpatory," the court below must decide if appellant was prejudiced by their admission and if their exclusion affects the sufficiency of proof that appellant introduced the marijuana on a military aircraft with intent to distribute it. *See* Art. 59(a), UCMJ, 10 USC § 859(a).

*Decision*

The decision of the United States Air Force Court of Criminal Appeals is set aside. The record of trial is returned to the Judge Advocate General of the Air Force for remand to that court for further consideration of the granted issue. Thereafter the record of trial will be returned directly to this Court.

Chief Judge COX, Judges SULLIVAN and CRAWFORD, and Senior Judge EVERETT concur.