UNITED STATES, Appellee,

v.

Specialist Eric A. EGAN, United
States Army, Appellant.

ARMY 9800414.

U.S. Army Court of Criminal Appeals.

12 May 2000.

For Appellant: Captain Blair T. O'Connor, JA (argued); Colonel John T. Phelps II, JA; Colonel Adele H. Odegard, JA; Major Kirsten V.C. Brunson, JA; Captain Scott A. de la Vega, JA (on brief); Major Scott R. Morris, JA.

For Appellee: Captain Katherine M. Kane, JA (argued); Colonel Russell S. Estey, JA (on brief); Captain Mary E. Braisted, JA.

Before TOOMEY, Senior Judge, CARTER, and NOVAK, Appellate Military Judges.

## OPINION OF THE COURT

NOVAK, Judge:

A military judge sitting as a special court-martial convicted the appellant, contrary to his pleas, of attempted distribution of 3,4 methylenedioxymethamphetamine (commonly known as "ecstasy")[1] and wrongful use of marijuana, cocaine, and ecstasy, in violation of Articles 80 and 112a, Uniform Code of Military Justice, 10 U.S.C. §§ 880 and 912a [hereinafter UCMJ]. The convening authority approved the adjudged sentence to a bad-conduct discharge (BCD), confinement for forty-five days, forfeiture of $600.00 pay per month for six months, and reduction to Private E1. This case is before the court for automatic review pursuant to Article 66, UCMJ, 10 U.S.C. § 866.

We have reviewed the briefs of both parties and the appellant's supplemental brief, and we heard excellent argument by both government and defense appellate counsel. We hold that: (1) the military judge erred by admitting the statements of two unavailable witnesses as statements against penal interest; (2) without the improperly admitted statements, the appellant's confession to dis-

---

1. The appellant was charged with distribution of ecstasy, and the military judge found him guilty of the lesser included attempt.

tribution of ecstasy was insufficiently corroborated;[2] and (3) the special court-martial convening authority did not have authority under the applicable joint service directive to convene a special court-martial empowered to adjudge a BCD in the case of an Army soldier.

## Facts

The appellant was assigned to the United States European Command (EUCOM) Joint Analysis Center (JAC) at Royal Air Force Base Alconbury, Alconbury, England, United Kingdom. The United States European Command is a joint force command. At the time of the appellant's court-martial, the JAC was commanded by an Air Force colonel. In September 1997, the appellant confessed to a special agent of the Air Force Office of Special Investigations (OSI) to numerous incidents of drug use and distribution. On 9 January 1998, charges were preferred against the appellant for these drug offenses. The appellant's Army chain of command declined to refer these charges to court-martial. Thereafter, on 19 February 1998, identical charges were preferred and processed through the appellant's joint chain of command. The appellant was held past his expiration of term of service (ETS) and the JAC commander, a special court-martial convening authority, referred the appellant's case to a special court-martial.[3] An Army military judge tried the appellant. The trial counsel was an Air Force officer. The appellant's trial defense team contained military attorneys from both the Army and the Air Force.

Days before trial, OSI agents took sworn, written statements about the appellant's involvement with illegal drugs from Mr. Ian Carter and Mr. Todd Zellers, two British individuals named in the appellant's confession. Because their statements mentioned their own involvement with illegal drugs, both men, after being sworn as witnesses at trial, refused to answer questions for fear of incriminating themselves.

The military judge declared Mr. Carter and Mr. Zellers unavailable and admitted portions of their statements pursuant to Military Rule of Evidence 804(b)(3) [hereinafter Mil.R.Evid.] as statements against penal interest. He also admitted the appellant's personal address book, containing addresses and phone numbers for the people and places the appellant mentioned in his statement to OSI. The judge also heard the testimony of a British constable detective about the local prices of illegal drugs and about the involvement in the local drug scene of the individuals named in the appellant's confession. The appellant unsuccessfully raised at trial, or in post-trial matters, the assignments of error submitted on appeal.

## Statements against Penal Interest

### Law

The United States Constitution guarantees, "[i]n all criminal prosecutions, [that an] accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. This confrontation right forces all witnesses "to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth.'" *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (footnote and citation omitted). *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), establishes a two-pronged test for admissibility of hearsay statements when witnesses are unavailable: 1) if "the evidence falls within a firmly rooted hearsay exception"; or 2) if it contains such "particularized guarantees of trustworthiness" that adversarial testing would be expected to add little to the statements' reliability.

A statement against penal interest is an exception to the hearsay rule which was established on the theory that "someone usually does not make a statement that may send him to jail or cost him money unless he believes it to be true." *United States v. Baran*, 22 M .J. 265, 268 (C.M.A.1986) (Ever-

---

2. The appellant does not challenge the adequacy of the corroboration for the three use specifications, and we find the evidence of these specifications to be legally and factually sufficient, even absent the two challenged hearsay statements. UCMJ art. 66.

3. All parties to the trial understood, and the JAC commander clarified during the trial, that the appellant's court-martial was referred to a special court-martial empowered to adjudge a bad-conduct discharge.

ett, C.J., concurring). Military Rule of Evidence 804(b)(3) thus provides in pertinent part:

> The following are not excluded by the hearsay rule if the declarant is unavailable as a witness.
>
> . . . .
>
> (3) *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the position of the declarant would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

In *United States v. Jacobs,* 44 M.J. 301, 306 (1996), our superior court, recognizing the Supreme Court's failure to rule on the matter and the lack of unanimity in the federal courts, held that statements against penal interest admitted pursuant to Mil. R.Evid. 804(b)(3) constitute a "firmly-rooted" hearsay exception and may be admitted without further corroboration or independent evidence as to their reliability. The Supreme Court more recently, however, addressed whether statements against penal interest are admissible as "firmly-rooted." In doing so, the Court first observed:

> [D]ue to the sweeping scope of the label, the simple categorization of a statement as a " 'declaration against penal interest' . . . defines too large a class for meaningful Confrontation Clause analysis." In criminal trials, statements against penal interest are offered into evidence in three principal situations: (1) as voluntary admissions against the declarant; (2) as exculpatory evidence offered by a defendant who claims that the declarant committed, or was involved in, the offense; and (3) as evidence offered by the prosecution to establish the guilt of an alleged accomplice of the declarant. It is useful to consider the three categories and their roots separately.

*Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 1895, 144 L.Ed.2d 117 (1999) (citations omitted). The court then concluded that statements in the first category, when offered into evidence against their makers, "carry a distinguished heritage confirming their admissibility." *Id.* Statements in the second category, because they are offered by an accused, do not implicate the Confrontation Clause at all. Statements in the third category, however, are "inherently unreliable" because of the declarant's " 'strong motivation to implicate the [appellant] and to exonerate himself.' " *Id.* at 1897, 1898 (quoting *Bruton v. United States,* 391 U.S. 123, 141, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (White, J., dissenting)). This third category is thus "*not* unambiguously adverse to the penal interest of the declarant" and the statements do not fall within a firmly rooted exception to the hearsay rule. *Id.* at 1898 (quoting *Lee v. Illinois,* 476 U.S. 530, 552–53, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) (Blackmun, J., dissenting)).

Statements offered to establish the guilt of a declarant's accomplice may still be admissible, however:

> "[T]he presumption of unreliability that attaches to codefendants' confessions . . . may be rebutted." . . . Nonetheless, the historical underpinnings of the Confrontation Clause and the sweep of our prior confrontation cases offer one cogent reminder: It is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old *ex parte* affidavit practice—that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing.

*Lilly,* 119 S.Ct. at 1900 (citations omitted). Stated another way, *Ohio v. Roberts'* "particularized guarantees of trustworthiness" must be established by relevant circumstances "that surround the making of the statement and that render the declarant particularly worthy of belief." *Idaho v. Wright,* 497 U.S. 805, 819, 110 S.Ct. 3139, 111 L.Ed.2d 638

(1990) (cited in *United States v. Hughes*, 52 M.J. 278 (2000)).

On appeal, appellate courts "independently review whether the government's proffered guarantees of trustworthiness satisfy the demands of the [Confrontation] Clause." *Lilly*, 119 S.Ct. at 1900.

Even assuming a statement against penal interest is found to be admissible under either *Ohio v. Roberts* prong, that preliminary decision does not end a court's inquiry. The Supreme Court held that Federal Rule of Evidence 804(b)(3), which is almost identical to Mil.R.Evid. 804(b)(3), "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." *Williamson v. United States*, 512 U.S. 594, 601, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). Thus, a judge must make "a fact-intensive inquiry" to determine "whether each of the *statements* in [a] confession [i]s truly self-inculpatory." *Id.* at 605, 114 S.Ct. 2431 (emphasis added). This inquiry involves an examination of all the circumstances, including whether the statement was "motivated by a desire to curry favor with the authorities." *Id.* at 601, 114 S.Ct. 2431 (quoting 28 U.S.C.App., p. 790). "A declarant may believe that a statement of guilt to authorities is in his interest to some extent, for example as a way to obtain more lenient treatment, or simply to clear his conscience." *Id.* at 617, 114 S.Ct. 2431. Justice Scalia further opined that "a declarant's statement is not magically transformed from a statement against penal interest into one that is inadmissible merely because the declarant names another person or implicates a possible codefendant" when the naming of another person is not done "in a context where the declarant is minimizing culpability or criminal exposure .... The relevant inquiry ... must always be whether the particular remark at issue ... meets the standard set forth in [Fed.R.Evid. 804(b)(3) ]." *Id.* at 605, 114 S.Ct. 2431.

■■ Finally, as with the preliminary admission decision, we review *de novo* whether the individual statements admitted violate the Confrontation Clause. *See generally Lilly.* If a statement was admitted in violation of the Constitution, we must determine whether the error was harmless beyond a reasonable doubt, that is, "whether the evidence may reasonably have had an effect on the decision." *United States v. George*, 52 M.J. 259, 261 (2000).

### Discussion

In analyzing the admission of Mr. Carter's and Mr. Zellers' statements, we will determine first, whether the statements were made against penal interest; second, whether the statements needed to be and were trustworthy; third, whether the individual statements within the larger statements were admissible; and fourth, whether any improperly admitted statements harmed the appellant.

■ Turning to the first question, whether the statements were made against the declarants' penal interest, we must determine whether reasonable persons in their positions would not have made the statements unless they believed them to be true. Mil.R.Evid. 804(b)(3). Our superior court, in divided opinions, has held that the rule requires a subjective standard: "The criterion, however, is not whether a declarant's statement might be admissible to help convict him if at some later time he were brought to trial but, instead, whether the declarant would himself have perceived at the time that his statement was against his penal interest." *United States v. Greer*, 33 M.J. 426, 430 (C.M.A. 1991); *see also United States v. Wind*, 28 M.J. 381, 384 (C.M.A.1989); *Baran*, 22 M.J. at 268 n. 1 (Everett, C.J., concurring) ("If the declarant believed—however, unreasonably—that the statement benefited him, there is no assurance of trustworthiness, regardless of what a reasonable person would have believed.").

### Mr. Carter's Statement

■ When Mr. Carter gave his statement to OSI, we note that he was called to the OSI office to give witness testimony about the appellant's involvement with illegal drugs, not to confess to his own participation; he was not advised under either United States or British law of the potential consequences of making a statement; he was advised that

the United States Armed Forces had no jurisdiction to prosecute him; and the OSI agent neither assured him that he would not pass any incriminating statements to British authorities, nor did he inform him he would pass on any information. Both trial and defense counsel stipulated at trial that Mr. Carter told the defense counsel "that when [he] gave a statement to the Air Force investigators [he] did not expect that it would be used against [him]." Mr. Carter agreed at trial that he wouldn't have made the statement if he had thought it could be used against him; that he thought no one would find out about it, to include any court or Mr. Carter's father (apparently a "district counselor for the county"); that no one would do anything with the statement; and that he thought all he had to do was help out the investigators by making a statement and his involvement would be "over and done with." The last three assertions were contradicted by the interviewing OSI special agent, who described Mr. Carter as "extremely cooperative," providing both a verbal and written statement, and "willing to come and testify" prior to his interview by trial defense counsel, despite the lack of assurances about who might have access to his statement. Only the next day, according to the special agent, did Mr. Carter express reluctance to talk about his involvement with drugs for fear of prosecution by the British courts. We are not persuaded by this evidence that, at the time he gave it, Mr. Carter perceived his unwarned statement to OSI about the appellant's criminal activities to so subject Mr. Carter to criminal liability that he would not have made the statement unless he believed it to be true.

### Mr. Zellers' Statement

Like Mr. Carter, Mr. Zellers was called in to give witness testimony about the appellant's involvement with illegal drugs, not to confess to his own participation; he was apparently not advised under either United States or British law of the potential consequences of making a statement; he was aware that the United States Armed Forces

had no jurisdiction to prosecute him; and the OSI agent made no promises about whether any incriminating statements would or would not be passed to British authorities. Both trial and defense counsel stipulated at trial that Mr. Zellers told the defense counsel "that when [he] gave a statement to the Air Force investigators [he] was under the belief that it would not subject [him] to criminal liability." The OSI special agent testified, "Mr. Zellors (sic) stated that he was willing to provide a written statement and willing to provide a verbal statement. He was very (sic) and extremely reluctant to come into court and testify [because the appellant] is a friend of his [and because] he was afraid of the British police potentially trying to prosecute him for anything that he might say that he was involved in." The agent had reason to believe that Mr. Zellers was "streetwise" and Mr. Zellers, the son of a former U.S. Air Force member, quickly brought up the Air Force's lack of jurisdiction over him. Under these circumstances, we conclude that Mr. Zellers perceived his unwarned statement to OSI about the appellant's criminal activities to so subject Mr. Zellers to criminal liability that he would not have made the statement unless he believed it to be true.[4]

### Reliability

Having determined that Mr. Zellers' statement as a whole was made against his penal interest, and assuming only arguendo Mr. Carter's statement was as well, we turn to the question of reliability. Neither statement was offered against the declarant or to exculpate the appellant. Thus, both fell in the third, "inherently unreliable" category of "accomplice" testimony. *Lilly*, 119 S.Ct. at 1897. In this regard, we are not troubled by the label "accomplice": whether labeled "accomplices" (*Lilly*), "codefendants" (*Bruton*), or mere "co-adventurers" (*Wind*), the appellant's confession describes himself, Mr. Carter, and Mr. Zellers as friends who were involved in an on-going scheme to obtain and use illegal drugs in their leisure time.

---

4. The results of our analysis would be the same were we to use the objective standard, i.e., to consider the motivation of a reasonable streetwise young British man involved in the local drug scene near a United States Armed Forces base.

Applying the principles cited in *Lilly*, we are not convinced that the circumstances under which either statement was made present sufficient guarantees of trustworthiness to rebut the presumption of unreliability that attaches to accomplices' statements. The government was involved in the production of both statements; both describe past events; and both have not been subjected to adversarial testing. *See Lilly*, 119 S.Ct. at 1900. In addition, the OSI intended neither statement to be incriminating to the declarant, but to furnish grist for the Government's prosecution mill. Both declarants stood to benefit from seeming to cooperate with OSI by providing information in some degree about the appellant's involvement with illegal drugs. As friends, they had a motive to minimize the appellant's participation in the local drug scene; as potential suspects, they had every motive to exaggerate his role while downplaying their own. In either case, their statements would lack reliability. We hold that the presumption of unreliability that attaches to both statements was not rebutted on the record before us. *Lilly*, 119 S.Ct. at 1900.

### Determining Admissibility of Portions of Statements

Although we have concluded that both statements were unreliable and thus improperly admitted, we will comment briefly on the *Williamson* parsing process. First, we compliment the military judge for trying to comply with *Williamson*, and for clearly underlining in red ink those sentences he actually considered from each statement. Next, we note that trial defense counsel forfeited a valuable opportunity to create a useful appellate record by refusing to participate in this process, steadfastly maintaining instead that the entire statements were inadmissible as not against penal interest. It is a dangerous tactic for the defense to fail to memorialize grounds for reversal and to simply rely on the appellate court's *de novo* review of the

matter. Finally, we remind military judges that the Supreme Court describes the selection of "truly self-inculpatory" portions of a statement as a "a fact-intensive inquiry." *Williamson*, 512 U.S. at 605, 114 S.Ct. 2431. To aid in appellate review, we encourage them to outline on the record their detailed justification for every portion of a statement they consider under Mil.R.Evid. 804(b)(3).[5]

### Harmless Error Analysis

■ Because the military judge improperly admitted portions of Mr. Carter's and Mr. Zellers' statements, we must assess whether his consideration of the admitted sentences was harmless beyond a reasonable doubt.

Because none of the admitted portions of Mr. Carter's statement are relevant to the challenged attempted distribution specification, we are confident that their admission was harmless beyond a reasonable doubt.

■ Mr. Zellers' statement presents a different issue. The military judge considered the following pertinent sentences from Mr. Zellers' statement:

> On another date [the appellant] said he was going back to London. A bunch of us asked him if he would bring us back some E's [ecstasy]. [The appellant] came back with around 6 or 7 hits of E. They were pink in color shaped hearts. In my opinion they were "sweets" (candy) and were not E's. I think he got ripped off. I gave him 10 pound (British Sterling) for the first E and I wouldn't pay him for the second.

We can conceive two ways these sentences could have affected the verdict. First, this is the only admitted evidence that explains the military judge's finding that the appellant only attempted to distribute ecstasy, instead of distributing ecstasy as charged. Thus, although the sentences inculpated the appellant in a distribution, they also partially ex-

---

5. For example, the military judge considered from Mr. Carter's statement the sentences, "The second time [the appellant] smoked hashish out of a water bong at my residence at 3 Belt lane, Alconbury. After smoking, [the appellant] would appear sleepy and tired. Present during the smoking of the bong was me, Todd [Zellers],

Karen Dines and Matt Dunford." We are at a loss as to how this statement clearly implicates *Mr. Carter* in criminal activity, other than possibly constructive possession because the use was at Mr. Carter's residence or maybe use from the inference (but not admission) that he might also have been smoking the hashish.

culpated him by reducing his criminal liability to an attempt. Second, these sentences were used to corroborate the appellant's confession. The answer to whether their admission reasonably affected the verdict is therefore best answered by analyzing whether the appellant's confession was adequately corroborated without the improperly admitted statement. For the reasons set out below, we conclude that the confession was not adequately corroborated and that the admission of the above-cited portions of Mr. Zellers' statement was not harmless beyond a reasonable doubt.

## Corroboration of the Confession

### Law

Military Rule of Evidence 304(g) provides in pertinent part:

> An admission or a confession of the accused may be considered as evidence against the accused on the question of guilt or innocence only if independent evidence, either direct or circumstantial, has been introduced that corroborates the essential facts admitted to justify sufficiently an inference of their truth.... If the independent evidence raises an inference of the truth of some but not all of the essential facts admitted, then the confession or admission may be considered as evidence against the accused only with respect to those essential facts stated in the confession or admission that are corroborated by the independent evidence....
>
> (1) *Quantum of evidence needed.* The independent evidence necessary to establish corroboration need not be sufficient of itself to establish beyond a reasonable doubt the truth of facts stated in the admission or confession. The independent evidence need raise only an inference of the truth of the essential facts admitted. The amount and type of evidence introduced as corroboration is a factor to be considered by the trier of fact in determining the weight, if any, to be given to the admission or confession.

▉ The purpose of the rule requiring corroboration of confessions by independent evidence is to establish the trustworthiness or reliability of the confession so as to prevent convictions based on false confessions. *See United States v. Yeoman*, 25 M.J. 1, 4 (C.M.A.1987). By its own terms, the rule requires that the independent evidence merely raise an inference of the truth of the essential facts admitted. Hence, the corroborative evidence need not prove the charged offense beyond a reasonable doubt, "as long as there is substantial independent evidence that the offense has been committed, and the evidence as a whole proves beyond a reasonable doubt that defendant is guilty." *Smith v. United States*, 348 U.S. 147, 156, 75 S.Ct. 194, 99 L.Ed. 192 (1954); *see also United States v. Melvin*, 26 M.J. 145, 146–47 (C.M.A. 1988). Moreover, the required independent evidence does not have to corroborate every element of the confessed offense or even the *corpus delicti* of the offense. *See Opper v. United States*, 348 U.S. 84, 93, 75 S.Ct. 158, 99 L.Ed. 101 (1954); *United States v. Cottrill*, 45 M.J. 485, 489 (1997); *United States v. Maio*, 34 M.J. 215, 218 (C.M.A.1992); *see also Melvin*, 26 M.J. at 146. Therefore, the quantum of evidence required has been described as "not great," and even "very slight." *Melvin*, 26 M.J. at 146; *see also Yeoman*, 25 M.J. at 4. "Generally speaking," corroborating evidence need only " 'establish the trustworthiness of the' confession." *United States v. Rounds*, 30 M.J. 76, 80 (C.M.A.1990) (citations omitted).

### Discussion

▉ The appellant claims that without the statements of Mr. Carter and Mr. Zellers, the record contains insufficient evidence to corroborate his confession to distribution of ecstasy, Specification 4 of the Charge. The appellant confessed that "[o]n or about the 20th of June, at the request of Matt Dines, Todd Zellers, Ian Carter and 2 brief acquaintances" who "gave [him] the money for the pills beforehand," he drove to "South Ealing, London" to purchase ten ecstasy pills; that he "bought the pills through Dee's London friends, names unknown," by waiting approximately two hours in the New Inn Pub until "Dee returned with" "10 pills at 10 pounds apiece (love hearts)"; and that he "drove back to Alconbury at which point, [he] made the exchange on or about the same

evening." The appellant also gave the price for ecstasy pills as "£8 to £12 depending on type and quality" and listed addresses for the individuals involved in the alleged distribution.

In addition to the portion of Mr. Zellers' statement cited in the penal interest discussion above, the government offered the following evidence at trial to corroborate the appellant's confession. First, Detective Constable Sergeant, a Drug Intelligence Officer for the area adjacent to the appellant's base, confirmed: that Mr. Zellers was involved in the drug trade, to include having been arrested for "dealing cannabis"; that Mr. Carter and Mr. Dines associated and used recreational drugs together; that locally, drugs were available in many village public houses and elsewhere, where there was any nightlife; that the price the appellant quoted for ecstasy was the "usual street price"; and that in his area of responsibility, ecstasy was not often used or seized. Second, the appellant's address book, seized during a search of his room, contained addresses or phone numbers for Mr. Carter, Mr. Dines, Dee, and the New Inn Pub.

Although the law only requires that corroboration evidence either directly or circumstantially justify sufficiently an inference of the truth of the appellant's confession, we decline to infer from the above evidence that the appellant's confession to wrongful distribution of ecstasy was truthful. The admissible corroborative evidence establishes only: that the appellant associated with a known local cannabis dealer and with known local recreational drug users on terms familiar enough to warrant his entering their names in his personal address book; that the appellant was familiar with the street price of ecstasy in and around Alconbury; that ecstasy was not a common drug in the civilian community near the appellant's post, but drugs could be obtained in any city with active nightlife; and that the appellant had enough familiarity with a New Inn Pub to enter its phone number in his address book. Such evidence of the appellant's involvement in the local drug scene and his familiarity with London (an area outside Detective Constable Sergeant's jurisdiction), while certain-ly suspicious, does not justify an inference that the appellant could obtain ecstasy in London and had a propensity to distribute ecstasy to his fellow users. *See Wind*, 28 M.J. at 382 ("Many people who possess or use drugs never sell them; and so some courts have held that, if an accused is tried for selling drugs and asserts an entrapment defense, evidence of his prior use or possession is inadmissible to establish his predisposition." (citations omitted)).

Consequently, we hold that the independent admissible evidence was not even "slightly" sufficient to corroborate the appellant's confession that he distributed ecstasy to Messrs. Carter, Zellers, and Dines, and conclude that the evidence was legally and factually insufficient to support the findings of guilty of attempted distribution of ecstasy. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner*, 25 M.J. 324 (C.M.A.1987); UCMJ art. 66(c), 10 U.S.C. § 866(c). As stated supra, the military judge's admission of Mr. Zellers' statement was thus not harmless beyond a reasonable doubt.

## Authority to Convene Special Courts–Martial

The appellant argued at trial and in his initial appellate brief that the language of a United States European Command (EU-COM) directive prohibited the local joint force commander from convening a court-martial to try him, especially where the servicing Army general court-martial convening authority had declined to refer identical charges. The JAC commander referred the appellant's case to a special court-martial pursuant to paragraph 7e, United States European Command Directive 45–4, Administration of Military Justice (8 Jan. 1997) [hereinafter ED]. Paragraph 7e(7) of that directive confers special court-martial authority upon the JAC commander, but states in the third and fourth sentences, "*Generally*, [such authority] will be exercised when the misconduct arises from a joint origin or has joint force implications. *Normally* courts-martial cases will be referred to the appropriate servicing legal office for referral and disposition." (emphasis added). We agree with the military judge that these sentences

did not prohibit the appellant's JAC commander from referring the charges against the appellant to a special court-martial, nor do they establish a requirement that the convening authority prove the joint origin or joint force implications of a given offense.

In his oral argument and in a supplemental brief, the appellant argues that the second sentence in paragraph 7e(7) of ED 45–4, cited infra, limits the JAC commander's authority to that granted Army special court-martial convening authorities by Army Regulation 27–10.[6] Under AR 27–10, an Army special court-martial convening authority would be limited to convening a special court-martial which is not empowered to adjudge a bad-conduct discharge. AR 27–10, para. 5–25b. A review of the several applicable Rules for Courts–Martial, UCMJ provision, publications, and regulations is necessary to analyze his claim.

Article 23(a)(6), UCMJ, 10 U.S.C. § 823(a)(6), confers authority to convene special courts-martial on the "commanding officer of any separate or detached command or group of detached units of any of the armed forces placed under a single commander for this purpose." Rule for Courts–Martial (R.C.M.) 504(b)(2)(A) defines "separate or detached" and cautions in the Discussion that "[t]he power of a commander of a separate or detached unit to convene courts-martial, like that of any other commander, may be limited by superior competent authority." Rule for Courts–Martial 201(e)(2)(A) states that "[a] commander of a unified or specified combatant command may convene courts-martial over members of any of the armed forces." Further, such a commander "may expressly authorize a commanding officer of a subordinate joint command or subordinate joint task force who is authorized to convene special and summary courts-martial to convene such courts-martial for the trial of members of other armed forces under regulations which the superior command may prescribe." R.C.M. 201(e)(2)(C).

The United States European Command is a unified combatant command. Joint Publication 0–2, Unified Action Armed Forces, Chapter IV (Doctrine and Policy for Joint Commands) (24 Feb. 1995) [hereinafter JP 0–2], establishes the authority for EUCOM to promulgate rules and regulations on military justice:

12. Uniform Code of Military Justice
Pursuant to the authority vested in the President under article 22(a), UCMJ, 10 U.S.C. § 822(a), and in Rules for Courts–Martial (RCM) 201(e)(2)(A) of the MCM, 1984, combatant commanders are given courts-martial jurisdiction over members of any of the Armed Forces. Pursuant to article 23(a)(6), UCMJ, subordinate [Joint Force Commanders (JFCs)] of a detached command or unit have special courts-martial convening authority. Under RCM 201(e)(2)(c), combatant commanders may expressly authorize subordinate JFCs who are authorized to convene special and summary courts-martial to convene such courts-martial for the trial of members of other Armed Forces.

13. Rules and Regulations
Rules and regulations implementing the UCMJ and MCM are, for the most part, of single-Service origin. In a **joint force**, however, the **JFC should publish rules and regulations that establish uniform policies** applicable to all Services' personnel within the joint organization where appropriate. For example, joint rules and regulations should normally be published to cover hours and areas authorized for liberty, apprehension of Service personnel, black market and currency control regulations, and other matters that the JFC deems appropriate.

. . . .

15. Trial and Punishment
a. **Convening Courts–Martial.** General courts-martial may be convened by the **commander of a combatant command.** An accused may be tried by a court-martial convened by a member of a different Military Service when the court-martial is convened by a JFC who has been specifically empowered by statute, the President,

---

**6.** Army Regulation 27–10, Legal Services: Military Justice (24 June 1996) [hereinafter AR 27–10], signed by the Secretary of the Army, con-

tains his "policy and procedure pertaining to the administration of military justice within the Army." AR 27–10, at Summary.

the Secretary of Defense, or a superior commander under the provisions of the RCM, 201(e)(2) of the MCM, to refer such cases for trial by courts-martial.

b. **Nonjudicial Punishment. The JFC may impose nonjudicial punishment upon any military personnel of the command,** unless such authority is limited or withheld by a superior commander. **The JFC will use the regulations of the offender's Service** when conducting nonjudicial punishment proceedings, suspension, mitigation, and filing.

European Command Directive 45–4 was promulgated pursuant to JP 0–2. Paragraph 7e, ED 45–4, states:

*Joint Analysis Center (JAC) Personnel.* Pursuant to [JP 0–2], the following policies are established:

(1). The JAC Commander (COMJAC) is responsible for the discipline of military personnel assigned to the JAC.

(2). COMJAC shall publish rules and regulations establishing uniform policies applicable to all Services' personnel within JAC where appropriate. Such rules and regulations will address, for example, hours and areas authorized for liberty, apprehension of service personnel and other matters COMJAC deems appropriate.

. . . .

(4). Discipline within the JAC will normally be exercised by JAC Service Unit Commanders. In addition, cases may be referred to an appropriate Service component command for resolution.

(5). COMJAC retains the option to impose NJP on JAC personnel. Generally this option will be exercised when the misconduct arises from a joint origin or has joint force implications.

(6). In accordance with Article 23(a)(6) [,UCMJ,] COMJAC is a Special Court–Martial Convening Authority.

(7). Pursuant to R.C.M. 201(e)(2)(A) and 201(e)(2)(C) of [*Manual for Courts–Martial, United States* (1996 ed.) ] COMJAC is authorized to convene Special Courts–Martial and Summary Courts–Martial over members of any of the Armed Forces assigned to JAC. *Subject to the policies and* *provisions of this directive and unless specifically withheld by USCINCEUR, COMJAC may exercise all disciplinary and administrative authority contained in [the MCM], and in the applicable regulations of a member's Service.* Generally this option will be exercised when the misconduct arises from a joint origin or has joint force implications. Normally courts-martial cases will be referred to the appropriate servicing legal office for referral and disposition.

(emphasis added).

■■■ The appellant asserts that even if the JAC commander was authorized to convene a special court-martial in his case, that court-martial was not empowered to adjudge a BCD under AR 27–10, paragraph 5–25, which allows a general court-martial convening authority to "authorize an assigned or attached [special court-martial (SPCM) ] convening authority to convene a SPCM empowered to adjudge a BCD if the command of the SPCM convening authority is substantially located within an area in which hostile fire or imminent danger pay is authorized." The JAC command was not substantially located in a hostile fire or imminent danger pay zone. Thus, the appellant argues that any special court-martial of an Army soldier convened by the JAC commander may not adjudge a BCD because of the limitation stated in paragraph 5–25, AR 27–10.

Because ED 45–4, paragraph 7e is promulgated "[p]ursuant to [JP 0–2]," we will start by analyzing the intent of paragraph 13 of JP 0–2. The second sentence encourages "**regulations that establish uniform policies** applicable to all Services' personnel." Not specified, however, is whether these regulations are intended to affect the processing of courts-martial. In fact, the last sentence would imply that the disciplinary regulations intended would be the sort usually promulgated by a local command, such as setting out prohibited personal conduct, listing hours for visitation in barracks' rooms, or governing possession and registration of weapons in addition to the subjects listed. *See also* ED 45–4, para. 7e(2). We conclude that JP 0–2 does not prohibit joint uniform regulations from displacing the court-martial processing

requirements of a servicemember's service, but also does not clearly express a preference that they do so.

The first sentence of paragraph 7e(7) of ED 45–4 establishes COMJAC's authority to convene special courts-martial. We are confident that this grant of authority is not redundant with paragraph 7e(6). Instead, the sentence serves to clarify that under R.C.M. 201(e)(2)(C), the general court-martial convening authority is granting, and not withholding from, COMJAC the authority to convene special courts-martial. The second, crucial sentence states that COMJAC "may" exercise that disciplinary authority contained in the servicemember's own service regulations. Noticeably absent from the sentence is a clarifying phrase such as "In addition to convening special courts-martial," or any other phrase that would explain the COMJAC's authority to convene special courts-martial empowered to adjudge a bad-conduct discharge despite Army regulations establishing more stringent requirements.

The drafters may have intended one of two results: first, that service regulations apply to courts-martial processing, embodying the concerns of services that their members not give up rights by virtue of an assignment to a joint unit;[7] or second, that only other provisions of service regulations, not affecting the processing of courts-martial, apply to the JAC commander's disciplinary and administrative actions, reflecting an interpretation of JP 0–2 that promotes uniform court-martial policies in a joint unit so all its members are subject to the same rules. Another possibility is that they may have overlooked or been unaware of the potential restrictions service regulations placed on convening authorities for court-martial processing. In any case, "the policy makers failed to clarify their intentions in choosing between ... competing policy considerations.... Under the circum-

stances, and in view of the requirement to resolve doubts in interpretation in favor of an accused, [we] will construe the regulations against the Government, which had an adequate opportunity to make the language more precise." *United States v. Broady*, 12 M.J. 963, 965 (A.F.C.M.R.1982) (footnote and citations omitted); *see generally United States v. Williams*, 29 M.J. 112, 115 (C.M.A. 1989) (regulations which form a basis for criminal sanctions must be strictly construed). In resolving the ambiguity in favor of the appellant, we hold that ED 45–4, paragraph 7(e)(7), as currently worded, restricts the JAC commander to that authority granted special court-martial convening authorities in applicable service regulations.

The remaining assertions of error, to include those raised personally by the appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), are, except as noted above, without merit.

The finding of guilty of Specification 4 of the Charge is set aside and Specification 4 of the Charge is dismissed. The remaining findings of guilty are affirmed. Reassessing the sentence on the basis of the errors noted, the entire record, and *United States v. Sales*, 22 M.J. 305 (C.M.A.1986), the court affirms only so much of the sentence as provides for confinement for forty-five days, forfeiture of $600.00 pay per month for six months, and reduction to Private El.[8]

Senior Judge TOOMEY and Judge CARTER concur.

---

7. We do not consider the requirement to apply a servicemember's regulatory protections in a given case as unduly burdensome, should a joint commander decide to refer a case to a court-martial. After all, JP 0–2 expressly requires the application of service regulations to all nonjudicial proceedings. Paragraph 7a(1), ED 45–4, governing Headquarters (HQ) EUCOM personnel, seems to support this interpretation: "Discipline of HQ USEUCOM personnel is normally a

Service responsibility and will be administered in accordance with Service regulations of the member concerned."

8. The result of our sentence reassessment would be the same regardless whether the appellant's court-martial was empowered to adjudge a bad-conduct discharge or was limited to a "straight special" court-martial.