**UNITED STATES, Appellee,**

v.

**Private First Class Karlos K. TRIPLETT, United States Army, Appellant.**

**ARMY 9800998.**

U.S. Army Court of Criminal Appeals.

30 April 2002.

For Appellant: Colonel Adele H. Odegard, JA; Major Scott R. Morris, JA; Major Kirsten V. Campbell–Brunson, JA; Captain Jimmonique R. Simpson, JA (on brief).

For Appellee: Major Patricia A. Ham, JA; Captain Arthur L. Rabin, JA (on brief); Colonel Russell S. Estey, JA.

Before CAIRNS, Senior Judge, CHAPMAN, and BROWN, Appellate Military Judges.

## OPINION OF THE COURT

BROWN, Judge:

At a fully contested trial, a general court-martial composed of officer and enlisted members convicted the appellant of conspiracy to commit rape, false official statement,[1] rape, larceny, and forcible sodomy, in violation of Articles 81, 107, 120, 121, and 125, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 907, 920, 921, and 925 [hereinafter UCMJ].[2] The convening authority approved the adjudged sentence to a dishonorable discharge, forfeiture of all pay and allowances, reduction to Private E1, and confinement for fifteen years.

This case is before the court for review pursuant to Article 66, UCMJ, 10 U.S.C. § 866. We have examined the record of trial, the briefs submitted by the parties, and the matters personally raised by the appellant pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982). As discussed below, we hold that: (1) the military judge erred in admitting certain portions of the redacted sworn statements of Specialist (SPC) Jones, a coconspirator and coactor, but the error was harmless beyond a reasonable doubt; (2) even without these erroneously admitted statements, the evidence supporting the appellant's convictions for conspiracy to commit rape and rape was legally and factually sufficient; (3) the evidence supporting the appellant's conviction for larceny was factually insufficient; and (4) the appellant's sentence was inappropriately severe. Re-

garding our latter two holdings, we provide relief in our decretal paragraph. The appellant's *Grostefon* matters merit neither comment nor relief.

## BACKGROUND

In early December 1997, Private First Class (PFC) R reported to her first permanent duty station, the K–16 Airbase in Seoul, Korea. She was nineteen years old and had been in the Army for approximately six months. On 19 December, PFC R accompanied several friends to the K–16 Community Club (the club) where, although she was underage, she consumed large amounts of alcohol. During the course of the evening, she testified that she drank eight, sixteen-ounce beers, which she purchased for herself, and four or five mixed drinks containing liquor, which were purchased by several male soldiers.

Toward the end of the evening, PFC R exhibited signs of heavy intoxication—her eyes were bloodshot, her speech was slurred, and she walked with difficulty. At least two people told PFC R that she was drunk. When her roommate, PFC Andrews, offered to walk her home, PFC R declined. As activity at the club waned, she left the club with SPC Jones and went to his room.

While PFC R and SPC Jones were alone in his room, they listened to music and began kissing. Specialist Jones also started rubbing PFC R's thighs. Private First Class R testified that she really did not want to be kissing SPC Jones. In an effort to stop his advances, she asked for a cup of water. Specialist Jones grabbed a cup and left the room. When he returned, four soldiers—Sergeant (SGT) Williams, SPC Downs (SPC Jones' roommate), SPC Slaughter, and the appellant—entered the room at approximately the same time. Private First Class R heard them talking quietly. Then she passed out on the bed.

---

1. The military judge merged two specifications of making a false official statement after arraignment, but prior to pleas. The panel convicted the appellant of the merged specification.

2. The members acquitted the appellant of a charge of obstructing justice, in violation of Article 134, UCMJ.

When she regained consciousness, she had no clothes on. She testified that the appellant was sitting on top of her and had his penis in her mouth. Unable to speak, she made some noises or sounds and moved her head from side to side. The appellant told her that everything would be all right and put his hands on her throat. She testified that she bit his penis in an effort to get the appellant off of her. When the appellant did get off, she noticed that SGT Williams was having vaginal intercourse with her. She testified that she succeeded in getting SGT Williams to stop by kicking and telling him to get off of her. She sat up in bed and said, "What's going on? This isn't right. I can't believe this is happening to me. What are you guys doing?" Several minutes later, PFC R passed out again.

She awoke to the sensation of hands on her breasts, inside her vagina, and elsewhere on her body. She recalled seeing the appellant and recalled people talking among themselves. Private First Class R testified that she passed out again, awoke briefly to similar touching and groping, and then passed out again until approximately 0915 the next morning. After she awoke that morning, she heard a knock on the door. Specialist Downs opened the door to let SPC Slaughter enter. Specialist Slaughter sat on the bed where PFC R laid and said, "I told you I should have walked you home.... You should have let me walk you home last night."

Private First Class R testified that she asked SPC Slaughter to go to SPC Downs' side of the room so she could dress. She dressed and started back to her barracks. Along the way, she realized that she was missing her wallet. She returned to SPC Jones' room and started looking for her wallet. Through the open door, she saw the appellant out in the hallway. As she stepped out into the hallway, the appellant held her wallet and asked, "Are you looking for this?" The appellant gave PFC R her wallet. She asked the appellant how he had obtained her wallet. The appellant replied that "somebody gave it to him," that she "should be

thankful," and that PFC R "owe[d] him for finding [the] wallet." The appellant also invited PFC R to check the contents and said that nothing should be missing because he did not touch anything. As she was walking back to her barracks, she finally checked the contents of her wallet. She testified that $60.00,[3] which she had won gambling on 19 December 1997, was missing from her wallet.

Although PFC R reported the events of that evening, she did not make a clear and complete "fresh complaint" because she was concerned about getting into trouble for underage drinking. Additionally, she could not remember everything, and she wanted to forget the rest. At one point, she refused to submit to a rape kit examination. She testified that she took three showers and washed all of the clothing that she had worn the night before. Eventually, PFC R provided a sworn statement to the Criminal Investigation Command (CID). While she provided more details to CID than she previously had provided to her chain of command, PFC R did not provide all the details that she recalled until she testified at the Article 32, UCMJ, hearing. On direct examination at trial, PFC R explained that she was unaware that she could return to CID and add to or correct prior statements.

On cross-examination, PFC R said that she remembered that SGT Williams and SPC Jones each bought her a mixed drink, but she did not know if the appellant did also. The appellant later testified that he did not purchase any drinks for PFC R. She admitted that there were several errors and omissions in her initial statements to her company commander and to CID.

Sergeant Williams testified[4] that on 19 December 1997, he went to the club with SPC Downs. While at the club, SGT Williams spoke with the appellant, but they did not socialize with each other for any length of time. Sergeant Williams testified that later he went to the room shared by SPC Downs and SPC Jones to check on SPC

---

3. The panel convicted the appellant of stealing approximately $40.00, as charged in the Specification of Charge IV.

4. As part of his own pretrial agreement with the convening authority, SGT Williams agreed to testify truthfully at the appellant's court-martial.

Downs. When SGT Williams left the room to use the latrine, he saw SPC Jones and PFC R enter the room. When he returned from the latrine, SGT Williams saw PFC R and SPC Jones sitting on the latter's bed. The appellant, SGT Boglin, and PFC Usher entered the room shortly thereafter. Sergeant Williams testified that sometime later he saw SPC Jones on top of PFC R on the bed. When he looked to SPC Jones' side of the room a moment later, SGT Williams saw SPC Jones getting off of the bed and saw the appellant straddling PFC R's chest. The appellant was attempting to put his penis in her mouth. He testified that PFC R was naked below the waist and characterized her as intoxicated. He testified that the appellant succeeded at one point in placing his penis in PFC R's mouth. At about the same time, SGT Williams recalled PFC R saying, "No, this isn't right," or words to that effect.

Sergeant Williams testified that, after SPC Jones got off the bed, SPC Jones retrieved several condoms and gave one to SGT Boglin and one to SGT Williams. Specialist Jones kept one condom for himself. While the appellant was still on top of PFC R, the others "were just standing around the bed." Sergeant Williams put on a condom. With the appellant still on top of PFC R, SPC Jones and SGT Williams fondled her. Sergeant Williams testified that, after the appellant got off of PFC R, SGT Williams briefly had vaginal intercourse with her.

On cross-examination, SGT Williams testified that, before going to SPC Downs' room, he never talked with the appellant about having sex with PFC R, and he did not enter into an agreement with anyone to have sexual intercourse with PFC R.[5] He also testified that he never saw the appellant engage in sexual intercourse with PFC R.

Staff Sergeant (SSG) Wayne testified, in part, that he saw the appellant on the morning of 20 December 1997. The appellant said that he had PFC R's wallet, which someone had found and had given to the appellant. When SSG Wayne offered to return the wal-

let to PFC R, the appellant said, "No, I [sic] give it to her, 'cause I need to talk to her, too.'" Staff Sergeant Wayne testified that later he observed PFC R remove some bills from her wallet. She told SSG Wayne that she was missing $20.00.

Sergeant First Class (SFC) Shelton testified, in part, that he was the installation duty officer during the shift of 19 and 20 December 1997. At approximately 0030, 20 December, he observed the appellant run into the barracks where female soldiers, including PFC R, lived. Some three minutes later, SFC Shelton observed the appellant run out of the female barracks towards the recreation center, which was closed. He saw the appellant meet up with PFC Usher outside the recreation center. At approximately 0045, SFC Shelton saw the appellant and PFC Usher in a different barracks—the building where the crimes occurred. They were talking with each other in the second floor hallway outside SPC Jones' room. After going to address some loud music on the third floor, SFC Shelton returned to the second floor, where he observed that SPC Slaughter had joined the appellant and PFC Usher. Thereafter, he did not see the appellant again before his duty ended at 0800, 20 December.

The government next called SPC Jones as a witness. At the time, SPC Jones was pending court-martial and he invoked his right against self-incrimination. The military judge ruled that SPC Jones was unavailable under Military Rule of Evidence 804(a)(1) [hereinafter Mil. R. Evid.].

Since the parties had anticipated that SPC Jones might invoke his right against self-incrimination, they litigated the admissibility of SPC Jones' three statements at an earlier motions hearing. At that hearing, after overruling the appellant's broad Confrontation Clause[6] objection, the military judge conducted a detailed, line-by-line review of the specific portions of SPC Jones' statements that the government sought to offer as

---

5. Despite this testimony, we note that SGT Williams pled guilty to and was provident to a charge of conspiracy to commit rape. He was convicted and sentenced on 26 June 1998, ap-

proximately three weeks before he testified in the appellant's court-martial.

6. U.S. Const. amend. VI.

hearsay statements against penal interest. *See* Mil. R. Evid. 804(b)(3). During the line-by-line review, the trial defense counsel did not object to most of the passages or phrases offered by the government. He interposed objections only to five brief passages or phrases. After hearing arguments on each specific objection, the military judge overruled three objections and sustained one. The defense withdrew their other objection. The military judge also permitted the appellant to introduce additional portions of SPC Jones' three statements under the rule of completeness. *See* Mil. R. Evid. 106, 304(h)(2). The government introduced the redacted statements through the testimony of CID Special Agents (SAs) Sackett and Cardella.

The government also used SAs Sackett and Cardella to introduce two sworn statements by the appellant. In his second statement, the appellant admitted to lying in his first statement when he denied having any knowledge of anyone engaging in sexual intercourse with PFC R on 20 December 1997 and when he denied having any sexual contact himself with PFC R that morning. Also in his second statement, the appellant stated that, after he entered SPC Jones' room, he heard what he thought to be the sounds "of someone having sex" emanating from SPC Jones' area. Shortly thereafter, SGT Williams told everyone, "hey, y'all, she's with it." The appellant asked SGT Williams what he meant, to which SGT Williams replied, "you know what I'm talking about." The appellant then went to SPC Jones' side of the room and observed SPC Jones apparently having sexual intercourse with PFC R while SGT Williams straddled her with his penis in her mouth. After SPC Jones ceased intercourse, SGT Williams began to have intercourse with PFC R. The appellant stated that he then leaned over PFC R and placed his penis in her mouth. He also admitted that he touched her breasts and started to

touch her vaginal area, but SGT Williams, who was having intercourse with her at the time, slapped his hand away. The appellant stated that PFC R moaned that she was "OK" with the activity, that she never said "no" or "stop," and that she seemed to enjoy performing oral sex on the appellant.

During the defense case, SGT Boglin testified on cross-examination that he observed the appellant engaging in oral sex "a couple of minutes" after the appellant entered SPC Jones' room. He also testified that at one point those in the room were laughing because SPC Jones was having sex "bareback," meaning without the protection of a condom.

The appellant testified in his own behalf.[7] He denied all charges except consensual sodomy. He denied having sexual intercourse with PFC R. He testified that PFC R was not drunk, that she initiated the sexual contact with the appellant, that he had a brief conversation with her shortly after their sexual activity, and that he did not observe her fall in and out of consciousness. Essentially, the appellant discounted the incriminating testimony of government witnesses by asserting that they were either lying or mistaken.

Regarding the issue of sentence appropriateness, we take judicial notice that SGT Williams and SPC Jones each were also tried at general courts-martial. Sergeant Williams pled guilty to and was convicted of conspiracy to commit rape[8] and rape. He had almost eight years of service and a prior special court-martial conviction for leaving the scene of an accident, in violation of Article 134, UCMJ, 10 U.S.C. § 934. The military judge sentenced him to a dishonorable discharge, forfeiture of all pay and allowances, reduction to Private E1, and confinement for five years. His pretrial agreement limited approved confinement to forty-two months. Specialist Jones pled guilty to and was convicted of conspiracy to commit rape,[9] rape,

7. A significant portion of the appellant's testimony, both on direct and on cross-examination, concerned the obstruction of justice charge, of which he was acquitted, and the larceny charge, the conviction of which we overturn.

8. Sergeant Williams pled guilty to and was convicted of conspiring with SPC Jones and PFC

Usher, but not the appellant. The conspiracy specification included the overt act of the appellant "put[ting] his penis in to the mouth of [PFC R]."

9. Specialist Jones pled guilty to and was convicted of conspiring only with SGT Williams, but not the appellant. The specification of which he was

and several other offenses. He had approximately two and one-half years of service. The military judge sentenced him to, and the convening authority approved, a dishonorable discharge, forfeiture of all pay and allowances, reduction to Private E1, and confinement for six years. He pled guilty without the benefit of a pretrial agreement.

## DISCUSSION

### I. The Military Judge's Decision to Redact and Admit Portions of SPC Jones' Sworn Statements

■ "Error may not be predicated upon a ruling which admits ... evidence unless the ruling materially prejudices a substantial right of [the accused], and ... a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context." Mil. R. Evid. 103(a)–(a)(1). We review a military judge's decision to admit hearsay evidence, over the appellant's objection, for an abuse of discretion. *United States v. Green*, 50 M.J. 835, 838 (Army Ct.Crim.App.1999) (citing *United States v. Hyder*, 47 M.J. 46, 48 (1997)). In the absence of a timely, specific objection, we test evidentiary rulings for plain error. Mil. R. Evid. 103(d); *see United States v. Powell*, 49 M.J. 460 (1998). We review de novo, however, whether a military judge's decision to admit hearsay statements violates the Confrontation Clause. *United States v. Egan*, 53 M.J. 570, 574 (Army Ct.Crim.App.2000) (citing generally *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999)).

In *Lilly*, the Supreme Court extensively examined the admissibility of hearsay "statements against penal interest" vis-à-vis the Confrontation Clause.[10] Regarding hearsay statements offered to establish the guilt of an accused, who is an alleged accomplice of an unavailable declarant, the Court reaffirmed earlier holdings that these statements are "inherently unreliable" because of the declarant's "strong motivation to implicate the defendant and to exonerate himself." *Lilly*,

527 U.S. at 132, 119 S.Ct. 1887 (citations omitted). The Court held that these statements do not fall within a firmly rooted exception to the hearsay rule. *Id.* at 134, 119 S.Ct. 1887. The Court further noted that these statements come attached with a presumption of unreliability that is unlikely to be rebutted if the government was involved in the statement's production. *Id.* at 137, 119 S.Ct. 1887. Given the historical underpinning of the Confrontation Clause, this presumption of unreliability can only be rebutted by "particularized guarantees of trustworthiness," such that a court can be confident that the declarant's truthfulness is so clear from the surrounding circumstances that the "test of cross-examination would be of marginal utility." *Id.* at 136, 119 S.Ct. 1887 (citation omitted).

■ In applying *Lilly*, this court has developed the following methodology to analyze and resolve the constitutional and evidentiary issues:

> In analyzing the admission of [the sworn] statements, we will determine first, whether the statements were made against penal interest; second, whether the statements needed to be and were trustworthy; third, whether the individual [redacted] statements within the larger statements were admissible; and fourth, whether any improperly admitted statements harmed the appellant.

*Egan*, 53 M.J. at 574.

■ First, the three sworn statements made by SPC Jones were collectively against his penal interest. He initially attempted to minimize his involvement and shift the criminal responsibility to the appellant, SGT Williams, and others. In his second and third statements, however, SPC Jones revealed his substantial, if not full, involvement in the conspiracy to rape PFC R and the rapes themselves. Taking the three sworn statements as a whole, a reasonable person in SPC Jones' position—a soldier under investigation for rape—would not have made

---

convicted included several overt acts involving the appellant.

10. For a brief historical discussion of the relevant case law regarding the admissibility of hearsay statements when witnesses are unavailable, see *Egan*, 53 M.J. at 572–74.

the statements unless he believed them to be true. This meets the evidentiary standard of Mil. R. Evid. 804(b)(3).

Second, SPC Jones' statements needed to be trustworthy, but were not. In the appellant's court-martial, SPC Jones' statements were not offered against the declarant himself or to exculpate the appellant. Thus, under *Lilly*, these statements do not fall within a firmly rooted hearsay exception to the hearsay rule. As such, the statements constitute "inherently unreliable" accomplice testimony when introduced against the appellant. After examining cases decided in the aftermath of *Lilly*, we question whether statements made to law enforcement officials can ever overcome this presumptive unreliability. *See, e.g., United States v. Ochoa,* 229 F.3d 631 (7th Cir.2000); *United States v. McCleskey,* 228 F.3d 640 (6th Cir.2000). Although CID sought and received incriminating evidence against SPC Jones, he certainly stood to benefit from his cooperation with CID. Additionally, the statements do not contain any " 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statements' reliability." *Lilly,* 527 U.S. at 125, 119 S.Ct. 1887 (citing *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)). Therefore, heeding the plurality of the Supreme Court in *Lilly,* we hold that the presumption of unreliability that attached to all three statements was not rebutted on the record before us.

Third, we examine the three individual portions of SPC Jones' statements that were admitted over defense objection.[11] At this point, we must commend the military judge for his thoughtful, line-by-line analysis of the proffered statements. The appellant was tried in June and July 1998—before *Lilly* was decided. But for the Supreme Court's subsequent decision in *Lilly,* it would appear that the military judge applied existing case precedent when he conducted the detailed parsing required by *Williamson v. United States,* 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994).[12] Each of the three challenged portions of SPC Jones' statements is self-inculpatory. Nevertheless, this self-inculpatory nature alone cannot support admissibility in the wake of *Lilly.* We hold that the three challenged portions of SPC Jones' statements, to the extent that they were admitted to inculpate the appellant, are still presumptively unreliable. Further, the government did not—and probably could not—overcome this presumption of unreliability. With the hindsight afforded by *Lilly,* the military judge erred in admitting, over defense objection, the three portions of SPC Jones' statements. With regard to the remainder of SPC Jones' redacted statements, which were admitted without defense objection, we find no error that was plain or obvious. *Powell,* 49 M.J. at 463–64.

■ Lastly, because the statements were admitted in violation of the Constitution, we must determine whether the error was harmless beyond a reasonable doubt. When the error in admitting evidence is of constitutional dimension, the test for harmlessness is "whether the evidence may reasonably have had an effect on the decision." *United States v. George,* 52 M.J. 259, 261 (2000) (citing *United States v. Bins,* 43 M.J. 79, 86 (1995)). If, based on our de novo review, we conclude that the erroneously admitted evidence reasonably had *no* effect on the decision, the error was harmless beyond a reasonable doubt. *Id.*

■ We conclude that SPC Jones' statements are merely cumulative of far more powerful evidence of the appellant's guilt. First, the appellant judicially confessed at trial to engaging in sodomy, albeit consensual, with PFC R on the bed. Second, SGT

---

11. As detailed in the Appendix to this opinion, the three portions of SPC Jones' statements admitted over defense objection were: (1) "while [the appellant] was on the bed, then I stopped and asked them what they were going to do"; (2) "I got very angry because I wanted to have sex with [PFC R], and I told [the appellant] to get off of her"; and (3) "Q: Why were you telling WILLIAMS and [the appellant] to get off of [PFC R]? A: Because I wanted to be the one having sex with her."

12. In *Williamson,* the Supreme Court held that Federal Rule of Evidence 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." 512 U.S. at 600–01, 114 S.Ct. 2431.

Williams testified that the appellant orally sodomized the intoxicated victim, who protested during the attack. Third, the appellant twice admitted in a sworn statement to CID that he engaged in sodomy with PFC R while SGT Williams was having sexual intercourse with her.[13] Fourth, SGT Boglin testified that just a "couple of minutes" after the appellant entered SPC Jones' room, SGT Boglin entered the room and observed some (unidentified) male having sex with PFC R while the appellant sodomized her. Fifth, PFC R testified that when she came out of a drunken stupor, the appellant was on her chest with his penis in her mouth and that SGT Williams was having sexual intercourse with her. This evidence, and more that was pertinent to the conspiracy, proved beyond any reasonable doubt that the appellant committed forcible sodomy, rape as a coconspirator, and conspiracy. The innocuous nature of the information admitted from SPC Jones' statements—essentially that the appellant was on the bed, that SPC Jones told the appellant to get off of PFC R, and that SGT Williams and the appellant may have been with PFC R on the bed at the same time—were at best cumulative with and pale in comparison to the overwhelming evidence of guilt summarized above. Specialist Jones' statements did not reasonably bolster or affect the findings of guilt. Therefore, we hold that the erroneous admission of these portions of SPC Jones' statements was harmless beyond a reasonable doubt and that the error reasonably had no effect on the outcome of the appellant's case. *See Egan,* 53 M.J. at 574 (citing *George,* 52 M.J. at 261).

## II. The Legal and Factual Sufficiency of the Evidence on the Conspiracy to Commit Rape and Rape Offenses

The appellant argues that there was insufficient credible evidence to establish that he conspired with SGT Williams (or anyone

else) to commit rape or that the appellant committed rape himself. We disagree.

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner,* 25 M.J. 324 (C.M.A.1987) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). When testing for legal sufficiency, "this [c]ourt is bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Blocker,* 32 M.J. 281, 284 (C.M.A.1991). The test for factual sufficiency "is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," this court is itself convinced of the appellant's guilt beyond a reasonable doubt. *Turner,* 25 M.J. at 325.

In assessing legal and factual sufficiency, we look to all of the admissible evidence. We agree with the appellant that the record contains little direct evidence of an explicit verbal agreement between the appellant and SGT Williams to rape PFC R. Nevertheless, we are mindful that no particular words or form of agreement are required. Conspiracy may be established by circumstantial evidence, including the conduct of the parties. *See Manual for Courts–Martial, United States* (1998 ed.), Part IV, para. 5c(2) [hereinafter MCM]; *United States v. Cobb,* 45 M.J. 82, 84–85 (1996).

We find that the conduct of the appellant and SGT Williams amply prove an agreement to rape PFC R. With amorous intentions, SPC Jones took PFC R back to his room. Given her highly intoxicated state, PFC R was unable to consent at any time in the room.[14] With at least a half dozen [15]

---

13. At trial, both SGT Williams and the appellant denied having any sexual activity with PFC R *at the same time.* Sergeant Williams testified that no one engaged in sexual activity with PFC R while he had sexual intercourse with her. Likewise, the appellant testified that SGT Williams got on the bed with PFC R after the appellant got off the bed and was pulling his pants up. We

find their carefully crafted testimony about the timing of events to be devoid of any credibility.

14. Although not central to the appellant's legal and factual sufficiency challenge, we are convinced beyond a reasonable doubt that the appellant had no honest and reasonable belief that PFC R consented to any sodomy or sexual inter-

male soldiers in the room, several soldiers sexually assaulted PFC R. First, SPC Jones raped PFC R. Based on the appellant's sworn statement, we find as fact that, at some point after the sexual activity began in the room, SGT Williams approached the appellant and said, "hey, y' all, she's with it." The appellant asked SGT Williams what he meant, to which SGT Williams replied, "you know what I'm talking about." Shortly after this "invitation," the appellant became part of the conspiracy and joined the sexual exploitation of PFC R. Based on SGT Williams' and PFC R's testimony, we find as fact that while SPC Jones was raping PFC R, the appellant straddled the chest of the victim and began sodomizing her. Based on the testimony of SGT Williams and PFC R, we find as fact that while the appellant was sodomizing her, SGT Williams raped PFC R. The appellant's acts of straddling PFC R's chest and placing his hands on her throat constitute a force that facilitated her rape by SGT Williams. Rather than a series of random, unrelated crimes, the coordinated attacks on PFC R establish that the appellant and SGT Williams were acting in concert and shared their criminal intent. By SGT Williams' words and their collective actions, the appellant and SGT Williams entered into an agreement to rape PFC R. Having entered the conspiracy with SGT Williams, the appellant is likewise guilty of rape. MCM, Part IV, para. 5c(5).

Excluding SPC Jones' cumulative hearsay statements, we hold that the evidence is overwhelming and is legally and factually sufficient to sustain the appellant's conspiracy and rape convictions.

### III. The Legal and Factual Sufficiency of the Evidence on the Larceny Offense

■ With respect to the larceny conviction, the appellant argues that there was insufficient evidence to establish the elements of intent and wrongful taking and to establish the value of the property taken. For somewhat different reasons, we agree that the evidence is factually insufficient to sustain the conviction.

Clearly, the appellant told two different stories about how he came into possession of PFC R's wallet: he either found the wallet himself or received it from someone else. The panel convicted the appellant of stealing $40.00—not stealing the wallet.

Our concern with this conviction is that, given the circumstances and conflicting reports on how much money was stolen, we are not convinced beyond a reasonable doubt that *any* money was stolen. Private First Class R, who was heavily intoxicated, testified that she had won some money gambling on 19 December 1997. When the appellant returned the wallet, he invited PFC R to count the money because, he said at the time, nothing was taken. She initially declined to do so. Staff Sergeant Wayne testified that, shortly after the appellant returned PFC R's wallet, SSG Wayne observed her remove some U.S. currency from the wallet. She told SSG Wayne that $20.00 was missing; the government charged a larceny of $40.00; she testified at trial that $60.00 was missing.

While we find PFC R's testimony about the rapes and other sexual assaults to be very credible, we cannot discount the possibility, given her intoxication, the money she spent on drinks, and the trauma in the aftermath of her gang rape, that she simply lost track of how much money she had left. Upon the limited facts in the instant case, we cannot conclude that the government's evidence excludes "every fair and rational hypothesis except that of guilt." Dep't of Army, Pam. 27–9, Legal Services: Military Judges' Benchbook, p. 53 (30 Sept. 1996); *see also United States v. Harville*, 14 M.J. 270, 271 (C.M.A.1982). Therefore, we are not convinced beyond a reasonable doubt of the appellant's guilt of larceny. For purposes of our *Sales* [16] analysis, we consider the larceny offense to be far less severe than the conspiracy, rape, and forcible sodomy offenses. We will provide relief in our decretal paragraph.

---

course that night. *See* Rule for Courts–Martial 916(j).

**15.** The appellant, SGT Williams, SGT Boglin, SPC Jones, SPC Downs, and PFC Usher were all in SPC Jones' room at some point during the rape(s) of and sexual assaults on PFC R.

**16.** *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986).

## IV. Sentence Disparity and Sentence Appropriateness

The appellant asserts that this court should reassess and reduce his sentence because it is grossly disproportionate to that received by his coactors, SGT Williams and SPC Jones. We agree.

Pursuant to our statutory grant of authority, this court "may affirm only ... the sentence or such part or amount of the sentence, as [we] ... determine[ ], on the basis of the entire record, should be approved." UCMJ art. 66(c). When we review each case for sentence appropriateness, our power and duty to do justice includes achieving a goal of "relative uniformity." *See United States v. Olinger*, 12 M.J. 458, 461 (C.M.A.1982).

■■■ Generally, the appropriateness of a sentence must be judged on an individual basis after considering the nature and seriousness of the offense, as well as the character of the offender. *See United States v. Snelling*, 14 M.J. 267, 268 (C.M.A.1982). We are "required to engage in sentence comparison only 'in those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases.'" *United States v. Sothen*, 54 M.J. 294, 296 (2001) (quoting *United States v. Ballard*, 20 M.J. 282, 283 (C.M.A.1985) (quoting from the lower court's unpublished opinion)). An appellant who urges sentence comparison "bears the burden of demonstrating that any cited cases are 'closely related' to his or her case and that the sentences are 'highly disparate.'" *United States v. Lacy*, 50 M.J. 286, 288 (1999). If the appellant can satisfy these two prongs, then the burden shifts to the government to "show that there is a rational basis for the disparity." *Id.*

After examining the records of trial in the cases of the appellant, SGT Williams, and SPC Jones, we hold that: (1) the cases are "closely related"—all three soldiers were charged with and convicted of the several serious criminal acts against the same victim at the same time; (2) the cases resulted in "highly disparate" sentences; and (3) there is no rational basis for the differences between the sentences.

■■■ Regarding the first two *Lacy* prongs, we note that all three coactors were convicted of conspiracy to commit rape and rape of the same victim and were sentenced, in part, to a dishonorable discharge, forfeiture of all pay and allowances, and reduction to Private E1. Each coactor faced confinement for life. A military judge sentenced SGT Williams—convicted of only those offenses—to confinement for *five years*. Pursuant to a pretrial agreement, the convening authority approved only forty-two months of confinement. Specialist Jones was also convicted of several other less serious offenses. The convening authority approved the military judge's sentence of confinement for *six years*. The appellant's convictions included the forcible sodomy offense and other less serious offenses. The convening authority approved the panel's sentence of confinement for *fifteen years*.

In holding that no rational basis exists to explain the disparity between the sentences of the appellant and his coactors, we have weighed several factors. First, we find that the appellant was, at least in one respect, the least culpable of the coactors—he never had actual intercourse with PFC R. We find little, if anything, in their respective service records to distinguish among the three coactors. On the other hand, the appellant was the only coactor convicted of the serious offense of forcible sodomy. On most significant matters, his trial testimony lacked any credibility. Regarding the sentencing cases, the appellant, unlike his two coactors, took little responsibility and expressed minimal remorse for his conduct. While the appellant deserves a severe sentence, we find that the government failed to establish rational, cogent reasons to explain the great disparity between the sentences adjudged in these three cases. Applying the analytical framework of *Ballard, Lacy*, and *Sothen*, we hold that the appellant's sentence is disproportionately severe. In our decretal paragraph, we will reassess the disparate sentence and will approve only so much of the sentence as is fair and just. UCMJ art. 66(c).

## DECISION

The findings of guilty of Charge IV and its Specification are set aside, and Charge IV

and its Specification are dismissed. The remaining findings of guilty are affirmed. Reassessing the sentence on the basis of the errors noted, the entire record, and the principles in *United States v. Sales*, 22 M.J. 305 (C.M.A.1986), the Court affirms only so much of the sentence as provides for a dishonor-able discharge, forfeiture of all pay and allowances, reduction to Private E1, and confinement for ten years.

Senior Judge CAIRNS and Judge CHAPMAN concur.

## APPENDIX
### Statements of SPC Jones Admitted Against the Appellant

**Prosecution:**
**Exhibit 1a \***
**(21 Dec 97)**

I, CASEY L. JONES, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

. . .

By the time we left she was extremely drunk. Some of the time at the club I was dancing with her, and she was so drunk she could barely stand up.... About 2330, 19 Dec 97, I left the club and walked outside with [PFC R], who was so drunk she couldn't stand up. She was sitting on the ground saying she didn't want to go home yet, but I kept telling her it was time to go home.... I helped [PFC R] stand up, and I helped her walk to my room, room 226, Building 200, K16 Airbase.... I was touching her for awhile [sic], and I kept touching her *[1] while [the appellant] was on the bed, then I stopped and asked them what they were going to do....* [2] I got very angry because I wanted to have sex with [PFC R], and I told [the appellant] to get off of her.

. . .

*[3] Q: Why were you telling WILLIAMS and [the appellant] to get off of [PFC R]?*
*A: Because I wanted to be the one having sex with her.*

. . .

Q: How many times throughout the incident did you her [PFC R] say "No"?
A: Maybe 15, 20 times.
Q: How many times throughout the incident did you her [PFC R] say "Stop"?
A: Not as much. About 10 times.
Q: How much time during the incident was [PFC R] unconscious?
A: It was off and on.

. . .

A: No.///END OF STATEMENT///

**Prosecution:**
**Exhibit 2a \*\***
**(23 Dec 97)**

I, CASEY L. JONES, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH: I wish to make this statement to clarify my previous statement and to refute certain details from before.... I started touching [PFC R]; I was touching her breasts and vagina with my hands.... I knew they [sic] guys wanted to rape [PFC R], so told them all I had some condoms. I showed them where the condoms where [sic], in the top deck of my tape-cassette holder next to the door; I told the group I had two condoms, and WILLIAMS asked for one, so I gave him one of the condoms.... I was walking in and out of the room once they started.... [E]veryone who was there should get in trouble too.... I make this statement freely, and I accept the fact that by giving out condoms to my friends while they raped [PFC R], I sort of helped them rape her.

. . .

[A:] [PFC R] was fading in and out, she was so drunk.

. . .

---

\* The three statements admitted by the military judge over trial defense counsel's objections are in *italics*.

\*\* The trial defense counsel withdrew his objections to the *underlined* statements.

Q: Why did you make a false statement to CID when you were initially questioned in this matter?

A: I was scared.

. . .

///END OF STATEMENT///

Prosecution: Exhibit 3a (5 Jan 98)

I, Casey L. JONES, want to make the following statement under oath: . . .

I was not truthful in my previous statements regarding the incident which occurred inside my room with [PFC R]. When we first arrived at my room it was just the two of us. We began to kiss and touch each other. After a while I started touching her vaginal area and breasts. She removed her pants. . . . [PFC R] was in and out of consciousness. . . . I was mad and laid down on the bed next to her. After a couple of minutes, I began to touch her vaginal area and putting my fingers inside her. She didn't tell me anything so I then got up between her knees, lifted her legs and placed my penis inside her vagina. . . . [PFC R] sat up on the bed and yelled out "what's going on", like she didn't understand or know what just happened. . . . [PFC R] was still on the bed with her shirt, bra, and socks on. She was sitting up on the bed. I sat on the bed and talked with her for a few minutes. She then told me she was tired and wanted to sleep. She laid down and drifted off to sleep on my bed. After about 10 minutes, I started to touch her vagina again. After a few moments, she woke up, moved on top of me, placed my penis inside her vagina and we had sex. After we were done, we went to sleep. I woke up and went to work about 0530, 20 Dec 97. I left [PFC R] asleep on my bed.

Q: Did [PFC R] know you were trying to have sexual intercourse with her while [the appellant] was placing his penis inside her mouth?

A: No.

Q: Did you hear [PFC R] tell anyone other than [the appellant] to stop or "no"?

A: She kept saying that all along. I think she said to get off her, but it wasn't real loud.

Q: Was [PFC R] drunk during this incident?

A: Yes, she was out of it.

Q: In your opinion, was she able to make sense and understand what was happening that night?

A: She knew a little.

Q: Did you tell [PFC R] you were going to have sex with her the first time?

A: No.

Q: When [the appellant] had his penis inside her mouth, what was she doing?

A: Grabbing his waist.

Q: Was she trying to get him off her?

A: There wasn't much movement by her, and she didn't say much.

Q: Why didn't you tell the truth before?

A: Scared and I don't want to go to jail.

[Q:] Do you want to add anything to this statement?

[A:] Yes, I'm just glad I told the truth now and lets [sic] get it over with.

[Q:] Anything else?

[A:] No. END OF STATEMENT